UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

STEPHANIE HUME, as Administrator of the
Estate of TIMOTHY HUME a/k/a
TIMOTHY JAMES HUME, Deceased

       Plaintiff,

 v.

               DECISION AND ORDER

               Case # 12-CV-6378-FPG-JWF

FARR'S COACH LINES, LIMITED et al.,

       Defendants.

---

  Currently pending before the Court are three motions to dismiss filed by the Defendants in this case. Defendant Setra of North America, Inc. ("Setra") has filed a motion to dismiss the crossclaims asserted against it by two other Defendants, Farr's Coach Lines Limited ("Farr's Coach") and Rene Bisson ("Bisson"). ECF No. 73. Defendant Tarten Equipment Limited ("Tarten") has filed a motion to dismiss Plaintiff Stephanie Hume's ("Stephanie Hume" or "Hume") Amended Complaint. ECF No. 91. Finally, Tarten has filed a motion to dismiss the crossclaims asserted against it by Farr's Coach, Bisson, and various other defendants. ECF No. 94.

## **BACKGROUND**

  This case arises out of a crash between a coach bus and a tractor-trailer on July 22, 2011 in Junius, New York. Based on the Amended Complaint, Bisson was driving the coach bus as an employee of Farr's Coach at the time of the crash. The bus collided with a tractor-trailer driven by Timothy Hume, who was killed in the crash. Stephanie Hume is the daughter of Timothy Hume, and she brings this suit as administrator on behalf of his estate.

Hume has asserted claims sounding in negligence, strict products liability, and breach of warranty against a variety of parties including Bisson, Farr's Coach, Setra, and Tarten. Hume alleges that the crash was caused by a combination of factors including Bisson's negligent driving, Farr's Coach's employment of Bisson and its failure to diligently check his qualifications, Tarten's faulty repair of the bus's transmission prior to the crash, and Setra's manufacture of the bus and its request to Tarten to repair the bus's transmission. These Defendants have in turn asserted a flurry of crossclaims against each other, some of which are at issue in the discussion below.

## DISCUSSION

The Court first addresses Defendant Setra's motion to dismiss three of the crossclaims asserted against it. ECF No. 73. It then addresses Defendant Tarten's two related motions to dismiss for lack of personal jurisdiction. ECF Nos. 91; 94.

### I.    Setra's Motion to Dismiss

A brief background specifically relating to Setra's motion to dismiss is necessary. Bisson, the driver of the bus, has asserted crossclaims against Setra, the manufacturer of the bus, for negligent repair of the bus's transmission prior to the crash and for breach of warranty. Based on the allegations underlying his crossclaims, Bisson's version of events leading to the crash is generally as follows: On July 22, 2011, the bus Bisson was driving experienced mechanical problems relating to its transmission. As a result of these problems, Bisson was either driving the bus at a slow rate of speed or merging back onto the highway after a stop when Timothy Hume failed to yield the right of way to the bus. Timothy Hume then crashed his tractor-trailer into the back of the bus.

Bisson goes on to allege that Farr's Coach, which is Bisson's employer and the lessee of the bus, provided a warranty claim to Setra in the days prior to the crash concerning the bus's

damaged transmission.  In connection with its receipt of this claim, Setra undertook to repair the transmission, yet failed to properly do so and returned the bus to Farr's Coach while representing that the transmission was fixed.  The transmission then, of course, broke down right before the crash on July 22, 2011.

Thus, Bisson has brought three crossclaims relating to the bus's transmission against Setra.  ECF No. 51 at ¶¶ 29–60.  Setra has now moved to dismiss those crossclaims under Federal Rule of Civil Procedure 12(b)(6).  ECF No. 73.

A motion to dismiss crossclaims under Rule 12(b)(6) is evaluated under the same standard as a motion to dismiss a complaint under Rule 12(b)(6).  *See Mathis v. United Homes, LLC*, 607 F. Supp. 2d 411, 418–19 (E.D.N.Y. 2009).  The Court accepts the allegations in the crossclaims as true and draws all reasonable inferences in the crossclaimant's favor.  *See Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir. 2005).  However, the Court need not accept as true "[l]egal conclusions, deductions or opinions couched as factual allegations."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

To survive a motion to dismiss, the allegations "must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  To meet this standard, the factual allegations must permit the court "to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.  In short, the crossclaimant must set forth "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claim for relief.  *Twombly*, 550 U.S. at 556.

As a federal court in the state of New York sitting in diversity jurisdiction, the Court applies the substantive law of New York in analyzing the crossclaims.  *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).

3

Each of Bisson's crossclaims is analyzed separately below.

*1. Negligent Repair of the Bus's Transmission*

Defendant Bisson first asserts a crossclaim based on negligence against Setra. ECF No. 51 at ¶¶ 29–38. Notably, Bisson also asserts this same crossclaim against Daimler Buses North America, Ltd. ("Daimler"), which is another defendant in this case and which is, according to the Amended Complaint, the parent company of Setra. ECF No. 37 at ¶ 42. Bisson alleges that "prior to the July 22, 2011 accident, [Setra and Daimler] received and accepted a meritorious warranty claim presented by the Plaintiff's employer, Farr's Coachlines Limited, the le[s]see of the bus, concerning problems with the bus's transmission system." ECF No. 51 at ¶¶ 30–31. Setra and Daimler then allegedly failed to repair the transmission "and thereby breached their duty of reasonable care." *Id.* at ¶ 32. Setra and Daimler subsequently returned the bus to Farr's Coach and "represent[ed] that the bus, the transmission system and related systems were fully repaired and that the bus was fit to return to service over the roads." *Id.* at ¶¶ 33–34. Farr's Coach and Bisson relied on these representations and returned the bus to operation. *Id.* at ¶¶ 34–35. On July 22, 2011, the bus's transmission failed as a result of Setra and Daimler's negligent repair, and Bisson was not able to bring the bus to highway speed. *Id.* at ¶¶ 35–36. Bisson was then involved in the crash whereby he sustained serious injuries. *Id.*

In short, Bisson is making out a claim in tort for negligent repair of the transmission on the basis of a "warranty claim," *i.e.*, a contractual agreement, where Setra agreed to repair the transmission. *Id.* at ¶¶ 30–31. The Court notes briefly at the outset that under New York law, a breach of contract generally does not give rise to a separate claim in tort. *See Clark-Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 389 (1987). Furthermore, "merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." *Id.* at 390. This general principle is

4

somewhat problematic for Bisson as he makes clear from the opening paragraphs of the negligent repair crossclaim that the genesis for the crossclaim is a contractual relationship between the relevant parties. ECF Nos. 51 at ¶ 30 ("Defendants Setra and Daimler Buses received a warranty claim before July 22, 2011 . . . ."); 51 at ¶ 31 (Defendants received and accepted a meritorious warranty claim presented by . . . [Farr's Coach] . . . concerning problems with the bus's transmission system.").

There are, however, exceptions to the general rule that a simple breach of contract will not give rise to a claim in tort. For instance, where the contracting parties have a special relationship "of trust and confidence" that transcends the contract, New York courts have found that the contract breach can also give rise to a tort. *See, e.g., Rich v. New York Cent. & H.R.R. Co.*, 87 N.Y. 382, 398 (1882). Notably, New York courts also examine the "nature of the injury, the manner in which the injury occurred, and the resulting harm" in determining whether conduct that breaches a contract may further result in tort liability. *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552 (1992).

Here, for two reasons, the Court finds that it is at least possible for Bisson to state a negligence claim apart from his breach of contract claims. First, New York courts have indicated that repairers may be independently liable in tort "if, in response to a complaint concerning the very same operation which later caused the injury, the repairer undertook to make repairs and negligently failed to inspect to find the actual defect." *Vermette v. Kenworth Truck Co.,* 488 N.Y.S.2d 507, 509 (3d Dep't 1985), *rev'd on other grounds*, 68 N.Y.2d 714 (1986). Bisson's crossclaims allude to this basis for tort liability by stating that Setra was summoned to repair the transmission, and it then indeed undertook to repair the transmission. ECF No. 51 at ¶¶ 31–32. Second, the Court observes that Bisson is seeking damages for injuries beyond the pure economic loss that is typically associated with breaches of contract. *Id.* at ¶ 36. Bisson

seeks damages for, among other injuries, permanent disability and pain and suffering. *See id.* These injuries are the sort of personal injuries that are typically associated with tortious conduct. *Cf. Bellevue S. Assocs. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 293–295 (rejecting a tort claim against a defendant who had supplied defective floor tiles largely because the plaintiff's injury was not personal injury or property damage). In sum, it is possible for Bisson to state a tort claim here, and the Court will proceed to analyzing the sufficiency of the negligent repair crossclaim against Setra under the familiar dictates of *Twombly* and *Iqbal*.

In order to sufficiently plead a claim based on negligence, a plaintiff must allege the following: (i) "[T]he defendant had a duty of care to act reasonably to protect against foreseeable risks;" (ii) "the defendant breached that duty of care;" and (iii) "[the] plaintiff's injuries were the proximate cause of the breach." *Levine v. Sears Roebuck & Co.*, 200 F. Supp. 2d 180, 186 (E.D.N.Y. 2002).

In the context of repairers, it is important to note that a repairer does not have a duty to "inspect a machine for defects unrelated to the problem that it was summoned to correct." *Rutherford v. Signode Corp.*, 11 A.D.3d 922, 923 (4th Dep't 2004). Rather, the repairer's duty stems from the fact that it was "summoned specifically" to correct a problem. *See Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F. Supp. 3d 280, 287 (W.D.N.Y. 2014); *see also Wroblewski v. Otis Elevator Co.*, 9 A.D.2d 294, 296–97 (3d Dep't 1959) (finding that elevator repairmen could be found negligent if jury believed plaintiff made a specific complaint that an elevator was not working properly, elevator repairmen examined elevator and made assurances that elevator was in working order, and plaintiff relied on assurances). After then failing to correct the problem, a repairer is liable in negligence when it gives off the "deceptive appearance of safety" through "the misleading quality of [its] conduct and words." *Levine*, 200 F. Supp. 2d at 187 (citations and internal quotations omitted). In other words, a repairer is liable when, after

responding to a specific complaint, it negligently performs repair and thus "cloak[s] the defect, dull[s] the call to vigilance, and so aggravate[s] the danger." *Id.* (citations and internal quotations omitted).

With this standard in mind, the Court finds that Bisson's negligent repair crossclaim against Setra just inches past the threshold to survive a motion to dismiss. This is by no means an endorsement of the crafting of the crossclaim. Noticeably missing from the pleadings is any detail about, for instance, the complaint (or "warranty claim") that originally prompted Setra to repair the transmission, what, if any, representations Setra made to deceive Bisson into thinking the transmission was fully repaired, or the roles that Setra and Daimler played in jointly making the repair. Bisson essentially just alleges that Setra received a warranty claim concerning problems with the bus's transmission, it represented that the bus was fully repaired, and Setra and Daimler are both responsible. Other than stating that the repair was made "prior to the July 22, 2011 accident," the crossclaim is not even specific about when the repair was made.[1]

Nevertheless, Bisson's crossclaim against Setra alleges just enough to survive this stage of the litigation. Bisson has alleged that at some point prior to the crash, Farr's Coach used a "warranty claim" to specifically summon Setra to fix the bus's transmission. Setra undertook to fix the transmission, which establishes its duty as a repairer. Setra then failed to fix the transmission, and, consequently, it breached its duty. Setra then allegedly returned the bus to

---

[1]     All of these details are critical if Bisson is to eventually show that Setra is liable on a negligent repair theory. Given this lack of detail in the crossclaim—and given the fact that Setra's motion to dismiss is actually accompanied by a declaration from one of its employees that Setra "never performed any repair to the transmission of the [bus]" (ECF No. 73-3 at ¶ 5)— the Court certainly has doubts about whether Bisson is suing the right parties for the repair of the bus's transmission.

The Court advises Setra, however, that on a motion to dismiss, a district court may not consider material outside of the Complaint. *See Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988). Accordingly, in analyzing the sufficiency of the negligent repair crossclaim, the Court disregarded this declaration by a Setra employee. This sort of exhibit may be properly considered on a motion for summary judgment.

Farr's Coach while representing that the transmission system was fully repaired and that the bus could return to regular operation. Farr's Coach and Bisson relied upon these representations and returned the bus to operation. As a result of the faulty repair, Setra caused the harm; namely, the bus could not reach highway speed and was thus involved in the crash. These allegations support the idea that Setra created a "deceptive appearance of safety" through "the misleading quality of [its] conduct and words" and, if proven, would satisfy the elements of negligence. *Levine*, 200 F. Supp. 2d at 187 (citations and internal quotations omitted). Again, the allegations are undoubtedly sparse, but they are enough to allow the negligent repair crossclaim against Setra (ECF No. 51 at ¶¶ 29–38) to pass the motion-to-dismiss stage.

### 2. *Breach of Express and Implied Warranties Related to Repair of the Transmission*

Bisson also asserts a crossclaim based in contract against Setra that is parallel to the negligent repair crossclaim. Specifically, Bisson asserts that Setra breached express and implied warranties by failing to repair the bus's transmission. ECF No. 51 at ¶¶ 50–60. Again, this crossclaim is asserted against multiple parties: Setra, Daimler, and another defendant in this case, ZF Friedrichshafen AG ("ZF"). Based on Plaintiff Hume's Amended Complaint, ZF is the designer and manufacturer of the bus's transmission. ECF No. 37 at ¶ 48.

The Court observes that the breach of warranty allegations are, in essence, a cut-and-pasting of the negligent repair allegations, yet the word "representation[s]" is substituted for "warranties." Bisson begins the breach of warranty crossclaim by again alleging broadly that "prior to the July 22, 2011 accident [Setra, Daimler, and ZF] received and accepted a meritorious warranty claim presented by the Plaintiffs employer, Farr's Coachlines Limited, the les[s]ee of the bus, concerning problems with the bus[']s transmission system and/or related systems." ECF No. 51 at ¶¶ 51–52. Setra, Daimler, and ZF then allegedly failed to repair the transmission "in violation of the terms of their express and implied warranties to the Plaintiff and the Plaintiff's

employer." *Id.* at ¶ 53. These warranties were allegedly issued "at or about the time of the lease of the bus and/or at or about the time that the bus was returned to the Plaintiffs employer." *Id.* Setra, Daimler, and ZF subsequently returned the bus to Farr's Coach and "represent[ed] that the transmission system and related systems were fully repaired and that the bus was fit for return to regular operation over the roads." *Id.* at ¶ 54. Bisson relied on these express and implied warranties and returned the bus to operation. *Id.* at ¶ 55. On July 22, 2011, the bus's transmission failed and Bisson was not able to bring the bus to highway speed. *Id.* at ¶ 56. He was then involved in the crash at issue and sustained serious injuries as a result of the breaches of warranties. *Id.* at ¶ 57.

### i. Breach of Express Warranty

The Court first addresses Bisson's breach of express warranty crossclaim relating to the repair of the transmission. Breach of express warranty claims under New York law require "(i) a *material statement* amounting to a warranty; (ii) the buyer's *reliance* on this warranty as a basis for the contract with his immediate seller; (iii) the *breach* of this warranty; and (iv) injury to the buyer *caused* by the breach." *Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013) (emphasis in original) (citations omitted). As is clear from the standard, the actual "material statement amounting to a warranty" is critically important; it is so critical that courts require parties to specifically identify the statement even at the motion-to-dismiss stage. *Id.* (emphasis omitted). In short, to state a claim for breach of express warranty, the injured party must identify in the complaint the "specific words, promises or statements" made by the defendant. *Fisher v. APP Pharm., LLC*, 783 F. Supp. 2d 424, 432 (S.D.N.Y. 2011). The injured party must provide detail about "*where, when* or *how* the alleged promise or statement was provided." *Id.* (emphasis added). A failure to be specific about the express warranty at issue is fatal to the claim. *See Gelber v. Stryker Corp.*, 752 F. Supp. 2d 328, 335 (S.D.N.Y. 2010)

("Plaintiffs have failed to allege any affirmative statement made by Defendants regarding the safety or effectiveness of the product on which Plaintiffs actually relied. . . . Therefore, the Court finds that [they fail] to meet the *Twombly* pleading standard . . . ."); *Levy v. Bessemer Trust Co.*, No. 97 CIV. 1785, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997) ("For a breach of contract claim, Plaintiff must provide specific allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue"); *Richman v. W.L. Gore & Associates, Inc.*, 881 F. Supp. 895, 905 (S.D.N.Y. 1995) *modified on other grounds*, 988 F. Supp. 753 (S.D.N.Y. 1997) ("[P]laintiff fails to state what was expressly warranted by defendant . . . Accordingly, plaintiff's express warranty claim is not adequately pleaded and should be dismissed.").

Simply stated, a party pleading breach of express warranty must tell the Court what the express warranty is. Bisson has not done so. There is no specificity about the express warranty that Setra allegedly breached. Without a single quotation from the alleged warranty, Bisson asserts generally that Setra, Daimler, and ZF made "efforts and . . . representations and warranties both express and implied that the transmission system was fully repaired and that the bus was fit to return to service over the roads." ECF No. 51 at ¶ 55. Bisson noticeably fails to specify *where* the warranty was made, *how* it was made in terms of whether it was oral or written, or *when* it was made other than "at or about the time of the lease of the bus and/or at or about the time that the bus was returned to the Plaintiffs employer . . . following the warranty work." *Id.* at ¶ 53. Additionally, given the traditional importance of the relationships of the parties in any breach of warranty or contract claim, Bisson also noticeably omits any detail as to which party was expressly warranting to whom. For instance, did Setra, Daimler, and ZF all independently warrant to Farr's Coach and Bisson that the transmission was repaired? This seems implausible, but in any case, the crossclaim is not clear on any of it. For these reasons, the

express warranty crossclaim against Setra as to the repair of the bus's transmission (*Id.* at ¶¶ 50–60) is dismissed.

### ii. *Breach of Implied Warranty*

The breach of implied warranty claim against Setra also fails to meet basic pleading requirements. Bisson does not even identify what type of implied warranty Setra allegedly breached; he simply alleges that Setra failed to fix the bus's transmission "in violation of the terms of [its] express and implied warranties." *Id.* at ¶ 53.

The Court notes that there are a variety of types of implied warranties that may underlie contracts for goods and contracts for services including, for example, implied warranties of merchantability, fitness for a particular purpose, and workmanlike performance. These different types of implied warranties typically have their own elements and are thus subject to different analyses. *See Dayton Superior Corp. v. Spa Steel Products, Inc.*, No. 1:08-CV-1312, 2012 WL 113663, at *5–6 (N.D.N.Y. Jan. 13, 2012) (analyzing separately the implied warranties of merchantability and fitness for a particular purpose). For this reason, a party pleading breach of implied warranty must, once again, tell the court what the implied warranty is. Bisson has not done so. He has vaguely attempted to hold three Defendants liable for breach of the same unspecified implied warranty relating to service work on the bus. This sort of deficient pleading does not put Setra on notice of the claim against it, nor does it permit the Court to determine that Bisson has pled a plausible cause of action. Thus, the crossclaim for breach of implied warranty against Setra for repair of the bus's transmission (ECF No. 51 at ¶¶ 50–60) is also dismissed.

### 3. *Breach of Express and Implied Warranties Related to the Bus Itself* [2]

---

[2] Large sections of Setra's motion to dismiss regarding this crossclaim contain argument based directly on exhibits Setra has filed along with its motion to dismiss. On a motion to dismiss under Rule 12(b)(6), the Court does not consider exhibits or material outside of the Complaint. *See Anderson v. Buie*, No. 12-CV-6039, 2015 WL 9460146, at *17 (W.D.N.Y. Dec. 23, 2015) ("[T]he Court's job at [the motion-to-dismiss] stage is simply to take the Plaintiff's

The final crossclaim at issue is another breach of warranty claim by Bisson against Setra, Daimler, and ZF.  This crossclaim relates to the bus and its component parts as opposed to service work on the bus and those parts.  ECF No. 51 at ¶¶ 39–49.  Setra, once again, has moved to dismiss this crossclaim.  ECF No. 73.

Plaintiff starts out the crossclaim by alleging that Setra, Daimler, and ZF were all responsible for the design, manufacture, and sale of the bus and its parts: "Defendant Setra and/or the Defendant Daimler Buses and/or Defendant ZF Friedrichshafen AG designed, manufactured and sold the 2008 commercial bus and/or its component parts . . . either individually, or through a business plan whereby the Defendants and/or other corporate entities participated in a concert of efforts to bring about the business plan which included the design, manufacture and marketing of Setra buses in North America." *Id.* at ¶ 40.

Upon sale or lease of the bus, all three Defendants then allegedly "provided express warranties [in] various marketing materials, website materials, brochures and other written statements . . . that the bus was of sufficient design and quality to provide safe and luxurious comfort for its driver and passengers and was capable of being safely operated over the roads as a commercial bus capable of traveling hundreds of thousands of miles during its useful life." *Id.* The materials also allegedly "provided express warranties indicating that the bus's component parts and the bus as a whole were of a high quality, sufficient to be able to provide hundreds of thousands of miles of safe and luxurious travel for operators and their passengers." *Id.* at ¶ 41. The crossclaim then makes a passing reference to Section 2-313 of the Uniform Commercial Code (U.C.C.), which defines express warranties in the sale-of-goods context. *Id.* at ¶ 42.

---

allegations as true and test the legal sufficiency of those allegations. It is not to make findings of fact—again, the Court accepts the Plaintiff's well–pleaded facts as true. With the use of various exhibits, [the moving party] is essentially asking the Court to make findings of fact.") (internal citation omitted).  Accordingly, the Court has not considered either Setra's arguments based on exhibits outside the Complaint or the exhibits themselves.

Additionally, Bisson alleges that Setra, Daimler, and ZF provided implied warranties "at the time of original sale of the bus and at the time that the bus was leased to [Farr's Coach]." *Id.* Specifically, Bisson alleges Setra, Daimler, and ZF "provided implied warranties of merchantability pursuant to U.C.C. §2-315." *Id.*

Finally, Bisson alleges that both he and Farr's Coach detrimentally relied on these express and implied warranties. *Id.* at ¶ 43. Bisson then alleges that "[s]olely as a result of the breach of the Defendants' express warranties and implied warranties, the Plaintiff was caused to be injured and damaged in the accident occurring on July 22, 2011." *Id.* at ¶ 45.

The legal standard for breach of express warranty is stated above, but once again, the Court looks for (i) a *material statement* amounting to a warranty; (ii) the buyer's *reliance* on that statement; (iii) a *breach* of the warranty; and (iv) injury *caused* by the breach. *See Avola*, 991 F. Supp. 2d at 391. This analysis is the same in the sale-of-goods context, though the New York U.C.C. further defines express warranties as "any affirmation of fact or promise" or "any description of the goods" created by the seller that "becomes part of the basis of the bargain." N.Y. U.C.C. Law § 2-313(1)(a)-(b); *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014). Once again, a party pleading breach of express warranty must be specific and "lay[] out the precise terms of the express warranty allegedly relied upon." *Prue v. Fiber Composites, LLC*, No. 11-CV-3304, 2012 WL 1314114, at *10 (E.D.N.Y. Apr. 17, 2012).

Once again, Bisson has failed to satisfy basic pleading requirements. Bisson starts off his allegations by vaguely locating the express warranties at issue in "various marketing materials, website materials, brochures and other written statements." ECF No. 51 at ¶ 40. He then describes the warranties at a high level of abstraction—Setra allegedly provided that the bus could provide "safe and luxurious comfort" and that the bus and its parts were "of a high quality,

sufficient to be able to provide hundreds of thousands of miles of safe and luxurious travel." *Id.* at ¶¶ 40–41.

The Court first notes that these statements come dangerously close to what other courts have termed mere "puffery." *See, e.g.*, *Nigro v. Lee*, 63 A.D.3d 1490, 1492 (3d Dep't 2009) (finding that an advertisement that described a car as "gorgeous" was a "generalized expression [of] the seller's opinion of the car and constitutes no more than puffery, which should not have been relied upon as an inducement to purchase the vehicle" (internal quotations omitted)). Puffery is described in the New York U.C.C as an "affirmation merely of the value of the goods or a statement purporting to be merely the sellers . . . commendation of the goods," and such a commendation "does not create a warranty." N.Y. U.C.C. Law § 2-313(c)(2). Here, Setra's purported statements that the bus would provide "safe and luxurious comfort" for many miles strikes the Court as simply a commendation of the bus amounting to puffery.

Regardless of whether these statements are puffery, the allegations are not specific enough to survive a motion to dismiss. *See Prue*, 2012 WL 1314114, at *8 (dismissing an express warranty claim where the plaintiff merely alleged that defendants had "expressly warranted and represented the [materials] to be reasonably safe and fit for the use for which it was intended, of merchantable quality, and free from defects"). Bisson has, once again, left out any description of the relationship of the parties in this breach of warranty claim. In other words, he simply alleges that Setra, Daimler, and ZF all "provided express warranties," yet he noticeably leaves out whether all three of these parties "provided" warranties to Farr's Coach, Bisson, or both Farr's Coach and Bisson. ECF No. 51 at ¶¶ 40–41. The crossclaim does not even specify whether the warranties were provided during the *sale* of the bus or the *lease* of the bus—it abstractly says that the warranties were given when the bus was "originally sold, leased, or put into commerce." ECF No. 51 at ¶ 40. This makes it impossible to determine whether the

express warranties were, in the words of the New York U.C.C., "part of the basis of the bargain;" the Court is not even sure *what bargain* Bisson is referring to.  N.Y. U.C.C. Law § 2-313(1)(a). For these reasons, the express warranty crossclaims as to the bus and its component parts against Setra (ECF No. 51 at ¶¶ 39–49) are dismissed.

Bisson also briefly references an implied warranty in the crossclaim at issue: "Defendants provided implied warranties of merchantability pursuant to U.C.C. §2-315." ECF No. 51 at ¶ 42. First, the Court observes that Bisson has cited the wrong section of the New York U.C.C. for the implied warranty of merchantability.  Section 2-315 refers to the implied warranty of fitness for a particular purpose, while Section 2-314 refers to the implied warranty of merchantability.  N.Y. U.C.C. Law §§ 2-314, 2-315.  The two types of warranties are distinct.  The implied warranty of fitness for a particular purpose provides that "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." N.Y. U.C.C. Law § 2-315.  The implied warranty of merchantability, meanwhile, provides that the goods must be "fit for the ordinary purposes for which such goods are used." N.Y. U.C.C. Law § 2-314.

Regardless of which implied warranty Bisson is attempting to reference here, the crossclaim is also dismissed.  Bisson has simply alleged in formulaic fashion that the Defendants "provided implied warranties of merchantability pursuant to U.C.C. § 2-315." ECF No. 51 at ¶ 42.  The Court notes that Bisson does not even, at the very least, identify which good the warranty allegedly attaches to here, be it the bus or the transmission.  Subsequently, in a bare recitation of the elements for any breach of warranty claim, Bisson alleges that he "relied upon the Defendants' express and implied warranties to [his] detriment," and "as a result of the breach of the Defendants' express warranties and implied warranties, [he] was caused to be injured."

15

ECF No. 51 at ¶¶ 43, 45.  This is not enough.  Thus, the implied warranty crossclaim against Setra relating to the bus and its component parts (*Id.* at ¶¶ 39–49) is dismissed.

### 4.  *Forum Non Conveniens*

In its motion to dismiss, Setra also makes a brief argument that this entire action should be dismissed on *forum non conveniens* grounds.  ECF No. 73-1 at 15.  To provide a little background on this *forum non conveniens* argument, Daimler previously filed a motion to dismiss for lack of personal jurisdiction that alternatively sought dismissal based on *forum non conveniens*.  ECF No. 52-2 at 2.  In that motion, Daimler argued that a Canadian court would be a more appropriate forum for this action for a variety of reasons, including that four of the parties in the case are Canadian, the allegedly negligent repair of the bus took place in Canada, and Plaintiff Hume is not even a resident of New York.  *Id.* at 15–22.  In Setra's pending motion to dismiss, it does not raise any new arguments as to *forum non conveniens*; rather, it simply "incorporates by reference the arguments for dismissal on *forum non conveniens* grounds previously set forth by [Daimler] in its motion to dismiss the amended complaint."  ECF No. 52-2 at 16.

In a Decision and Order dated September 30, 2015, this Court denied Daimler's motion to dismiss without prejudice.  ECF No. 235 at 16–17.  In short, the Court determined that it would allow for a period of jurisdictional discovery before definitively ruling on its jurisdiction over Daimler and the *forum non conveniens* issue.  *Id.*

Daimler has recently renewed its motion to dismiss for lack of personal jurisdiction, and once again, this motion alternatively seeks dismissal based on *forum non conveniens*.  ECF No. 248.  Since Setra's *forum non conveniens* argument is simply an incorporation by reference of Daimler's *forum non conveniens* argument, the Court will deal with the *forum non conveniens* issue in a separate decision on Daimler's renewed motion.

### 5.  *Crossclaims for Contribution and Indemnification*

Finally, in Setra's motion to dismiss, Setra briefly references the crossclaims asserted

16

against it for contribution and indemnification by a variety of defendants, including Farr's Coach and Bisson. ECF No. 73-1 at 15–16. A discussion of these crossclaims is not in order here as Setra simply asserts that: "[T]he dismissal of Plaintiff's claims against [Setra], whether on *forum non conveniens* grounds, or based on any of the defenses set forth in [Setra]'s answer, would mean that all cross-claims against [Setra]—including Farr's Coach and Bisson's cross-claims for contribution or indemnification, which are entirely derivative of Plaintiff's claims—must be dismissed to the same extent." *Id.* (emphasis added). The passing reference to dismissal of "all cross-claims against [Setra]" has caused a flurry of responses to Setra's motion to dismiss by not only Farr's Coach and Bisson, but also by Tarten and ZF. ECF Nos. 95; 97; 119; 137. Tarten and ZF argue that their crossclaims for contribution and indemnification against Farr's Coach and Bisson should not be dismissed. ECF Nos. 95; 137.

The Court does not construe the quoted assertion by Setra as anything other than advice to the Court, namely, that in the event that the case is dismissed on *forum non conveniens* grounds or by reason of any of the defenses in Setra's answer to the Amended Complaint, the contribution and indemnification claims against it should also be dismissed.

In sum, for the foregoing reasons, Setra's motion to dismiss (ECF No. 73) is DENIED IN PART AND GRANTED IN PART. Setra's motion to dismiss the negligent repair crossclaims (*Id.* at ¶¶ 29–38) is denied, and its motion to dismiss the breach of warranty crossclaims, both related to service work on the bus and the bus itself (*Id.* at ¶¶ 39–60), is granted.

## II.     Tarten's Motions to Dismiss for Lack of Personal Jurisdiction

Defendant Tarten has filed two motions to dismiss for lack of personal jurisdiction. ECF Nos. 91; 94. The Court first provides a brief background relevant to these motions.

According to the Amended Complaint, Tarten is another party that negligently performed service work on bus's transmission prior to the crash. ECF No. 37 at ¶¶ 45, 54–55, 62, 66. The

parties appear to agree that Tarten performed the service work in Canada.  ECF Nos. 108 at ¶¶ 18–19, 21; 132 at 13–14 ("Plaintiff submits that Tarten Equipment Limited committed a tortious act within Canada which injured Plaintiff's decedent in New York.").   After negligently repairing the bus, Hume alleges that Tarten returned the bus to Farr's Coach while representing that the transmission was fully repaired.  ECF No. 37 at ¶¶ 56–57, 63, 74.  The damaged transmission then allegedly caused the crash on July 22, 2011.   *Id.* at ¶ 58.  Thus, Plaintiff asserts familiar claims against Tarten for negligent repair and breach of warranty.  *Id.* at ¶¶ 57, 58, 62, 66, 74–75, 77.  Similarly, Bisson and Farr's Coach assert crossclaims against Tarten for negligent repair and breach of warranty.  ECF No. 51 at ¶¶ 61–67.

In separate but substantively identical motions, Tarten now moves to dismiss both the Amended Complaint and the crossclaims asserted against it by Farr's Coach and Bisson for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  ECF Nos. 91; 94.  Notably, in Tarten's motion to dismiss the Farr's Coach and Bisson crossclaims, Tarten also states that "any and all cross-claims against Tarten" must also be dismissed for lack of personal jurisdiction.  ECF No. 94 at 2.  In other words, Tarten is moving here for dismissal of the all of the crossclaims for contribution and indemnification asserted against it.  Such crossclaims have been asserted against Tarten by multiple parties.  *See* ECF Nos. 50 at ¶¶ 100–111; 51 at ¶ 28; 58 at ¶¶ 47–49; 61 at ¶¶ 44–46; 65 at ¶¶ 18–19; 185 at ¶¶ 19–20.

In its motions to dismiss, Tarten states that it was incorporated in Canada and maintains its principal place of business in Canada.  ECF No. 91-1 at 4–5.  Tarten then recites as follows:  Tarten does not perform any diagnosis, maintenance, or repair of vehicles in New York; it is not authorized to do business in New York; it does not maintain offices in New York; it does not have any New York bank accounts; it does not pay taxes to New York; and it does not lease, own, or possess property in New York.  *Id.* at 5.  More specifically, Tarten asserts that it services

vehicles at its facilities in Canada (*id.*), and indeed, that it serviced the transmission of the bus at issue in Canada (ECF No. 108 at ¶ 21). Thus, it does not have sufficient contacts with New York to be haled into this Court for this lawsuit.

The legal standard for a motion to dismiss for lack of personal jurisdiction is well-established. The Plaintiff carries the burden of showing that personal jurisdiction over the defendant exists. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) (citations omitted). Here, Tarten filed its motions to dismiss prior to discovery, so the Plaintiff and Crossclaimants satisfy their burden by making "factual allegations [that] constitute a *prima facie* showing of jurisdiction." *Id.* In other words, to defeat Tarten's motions, the Plaintiff and Crossclaimants must allege facts which, if credited, would establish jurisdiction over Tarten. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). They may rely on pleadings, affidavits, and other supporting materials to make this *prima facie* showing. *See id.* Importantly, because the Court has decided not to hold a hearing on whether personal jurisdiction exists, the *prima facie* showing suffices "notwithstanding any controverting presentation by the moving party[] to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

This Court sits in diversity jurisdiction in the state of New York, so it exercises personal jurisdiction over the parties in accordance with the law of New York. *See DiStefano v. Carozzi North Am., Inc.,* 286 F.3d 81, 84 (2d Cir. 2001). New York courts follow two steps in analyzing personal jurisdiction. First, they determine whether jurisdiction lies pursuant to New York state law. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 357 (S.D.N.Y. 2004) (citations omitted). Second, they determine whether jurisdiction comports with the requirements of federal due process. *Id.* Only if both of these requirements are met does personal jurisdiction exist over a defendant, though notably, New York decisions often

conflate the two requirements. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 247 (2d Cir. 2007) ("New York decisions . . . at least in their rhetoric, tend to conflate the long-arm statutory and constitutional analyses by focusing on the constitutional standard . . . .").

Thus, the Court first turns to New York state law. The relevant provisions of New York's statutory law on personal jurisdiction are Sections 301 and 302 of New York Civil Practice Law and Rules ("C.P.L.R."). Section 301 of the C.P.L.R. provides a basis for jurisdiction over foreign corporations that are "doing business in New York not occasionally or casually, but with a fair degree of permanence and continuity." *Eastboro Found. Charitable Trust v. Penzer*, 950 F. Supp. 2d 648, 654 (S.D.N.Y. 2013) (citations and internal quotations omitted). Stated differently, the Court has jurisdiction over foreign corporations that are "engaged in such a continuous and systematic course of doing business [in New York] as to warrant a finding of [their] presence here." *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (citations and internal quotations omitted). Importantly, the jurisdiction contemplated in Section 301 is general jurisdiction, that is, jurisdiction over any and all claims against a defendant, regardless of whether the claims relate to the defendant's business in New York. *See Zibiz Corp. v. FCN Tech. Sols.*, 777 F. Supp. 2d 408, 416 (E.D.N.Y. 2011).

General jurisdiction is contrasted with specific or long-arm jurisdiction, which exists over a defendant only when the claims relate to the defendant's contacts with New York. *See id.* at 420. Long-arm jurisdiction is provided for in Section 302 of the C.P.L.R. The parties opposing Tarten's motion seek to invoke two different bases of long-arm jurisdiction described in Section 302. They argue that (i) Tarten "transact[ed] . . . business within the state" under C.P.L.R. § 302(a)(1), and (ii) Tarten "committ[ed] a tortious act without the state causing injury to person or

property within the state" under C.P.L.R. § 302(a)(3).[3]

Below, after briefly addressing whether general jurisdiction exists over Tarten, the Court addresses the two possible bases for long-arm jurisdiction.

### 1. General Jurisdiction

Hume has raised a cursory argument that Tarten is subject to general jurisdiction in New York. ECF No. 129-4 at 4–5. Briefly stated, the argument is that Tarten is doing business in New York with such a "measure of permanence and continuity" that it is subject to general jurisdiction here. *Id.* (quoting *Titu-Serban Ionescu v. E. F. Hutton & Co.*, 434 F. Supp. 80, 81 (S.D.N.Y. 1977).

In light of a relatively recent Supreme Court case, *Daimler AG v. Bauman*, --- U.S. ---, 134 S. Ct. 746 (2014), the Court does not find it necessary to discuss this argument at length. *Daimler* does not, of course, address general jurisdiction under C.P.L.R. § 301; rather, it addresses general jurisdiction under the requirements of federal due process. *Daimler,* 134 S. Ct. at 753. Here, however, because the Court finds the question of whether Tarten is subject to general jurisdiction under federal due process to be straightforward, it looks directly to whether

---

[3]     Crossclaimant Bisson also appears to try to invoke C.P.L.R. § 302(a)(2)—which provides for New York long-arm jurisdiction where a defendant "commits a tortious act within the state"—with the following single sentence in his response to Tarten's motion to dismiss: "Plaintiff [sic] Bisson also argues that the Movant Tarten committed a tortious act within the State of New York by putting into intrastate and international commerce, a defective bus which the Defendant actually knew or should have known would be operated over the roads of the State of New York as part of the business of Farr Coach Lines." ECF No. 127-2 at 5.
    No party has alleged that Tarten performed the repair anywhere other than a Canadian facility, and Bisson does not cite one case to support the notion that, based on its repair of the bus in Canada, Tarten "committ[ed] a tortious act within the state." *Id.* at 2–7; C.P.L.R. § 302(a)(2). Accordingly, the Court deems the argument waived. *See Lyn v. Inc. Vill. of Hempstead*, No. 03 Civ. 5041, 2007 WL 1876502, at *16 n. 13 (E.D.N.Y. June 28, 2007), *aff'd,* 308 F. App'x 461 (2009) (summary order) ("Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citations and internal quotations omitted).

conferring general jurisdiction over Tarten would comport with due process.  *Cf., e.g., McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967) (conflating the New York state law step and the federal due process step in analyzing personal jurisdiction).

*Daimler* established that, under federal due process, the bar for finding general jurisdiction over a foreign corporation is high; a foreign corporation will be subject to general jurisdiction only where its "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Daimler*, 134 S. Ct. at 761.  (citations, internal quotations, and internal alterations omitted).  The Second Circuit has further instructed district courts that after *Daimler*, "except in a truly exceptional case, a corporate defendant may be treated as essentially at home only where it is incorporated or maintains its principal place of business—the paradigm cases." *Brown v. Lockheed Martin Corp.*, --- F.3d ---, No. 14-4083, 2016 WL 641392, at *6 (2d Cir. Feb. 18, 2016) (quoting *Daimler*, 134 S. Ct. at 761 n. 19).

Here, there are absolutely no allegations by any party to support the argument that this case is the "exceptional case" where Tarten, a corporation that was incorporated in Canada and that maintains its principal place of business in Canada, is "essentially at home" in New York. *See Daimler*, 134 S. Ct. at 761 & n. 19 (citations and internal quotations omitted).  Hume has vaguely alleged in the Amended Complaint that Tarten "is a business entity doing business within the State of New York," that Tarten "is in the business of" repairing vehicles that it knows may be driven in New York, and that Tarten "regularly contracts" to work on products that it knows may be operated in the United States, which includes New York.  ECF No. 37 at ¶¶ 34, 44, 53.  All other allegations relating to Tarten concern its servicing of the actual bus at issue in this case.  These allegations are not nearly enough to support a finding that Tarten's contacts with New York are so exceptional that it is essentially at home in New York.  Accordingly, Hume has failed to make a *prima facie* showing that general jurisdiction exists over Tarten.

2. *Long-Arm Jurisdiction Pursuant to C.P.L.R. § 302(a)(1)*

The Court thus turns to the first potential basis for long-arm jurisdiction over Tarten. Hume and Bisson specifically seek to invoke C.P.L.R. § 302(a)(1), which provides for jurisdiction over a defendant that "transacts any business within the state or contracts anywhere to supply goods or services in the state." ECF Nos. 127-2 at 5; 132 at 10–13. As an initial matter, it is unclear whether Hume and Bisson are attempting to argue that Tarten falls under the "transaction of business" prong or the "supplying goods or services" prong of Section 302(a)(1), so both prongs are discussed below. *See Bank Brussels Lambert,* 171 F.3d 779, 786 (2d Cir. 1999). Importantly, Section 302(a)(1) provides a basis for specific jurisdiction, so Plaintiff's claims must specifically "arise from" the defendant's in-state activities. *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt. LLC,* 450 F.3d 100, 103 (2d Cir. 2006).

*i. Transaction of Business*

As for the first prong, in analyzing whether a defendant transacts business in New York, courts consider the following factors:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [the defendant] to send notices and payments into the forum state or subjects [the defendant] to supervision by [a] corporation in the forum state.

*Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 22–23 (2d Cir. 2004) (citations and internal quotations omitted). The ultimate determination is based on the totality of the circumstances, though notably, New York courts place special emphasis on the second factor—whether New York is the locale of significant contract negotiations. *See Bialek v. Racal-Milgo, Inc.,* 545 F.

Supp. 25, 34 (S.D.N.Y. 1982).

With these factors in mind, the Court reviews the factual allegations supporting the notion that Tarten transacted business within New York. There are, in short, not many such allegations. Plaintiff Hume alleges generally in the Amended Complaint that Tarten is "authorized to do business in the State of New York" and that it is "a business entity doing business within the State of New York." ECF Nos. 37 at ¶¶ 33–34; 136, at 5–6. These generalities do not help in forming a basis for specific jurisdiction, which requires, again, that the claims arise specifically from the defendant's in-state contacts. Plaintiff then makes a variety of allegations in the Amended Complaint regarding Tarten performing work on buses at one of its facilities when it knew or should have known that the buses would be operated in New York. *See, e.g., id.* at ¶¶ 44, 45, 53. It may be true, of course, that Tarten worked on buses that it knew or should have known would eventually be operated in New York, but that certainly does not at all constitute Tarten *transacting business within* New York.

Hume attempts to bolster these thin allegations in her response to Tarten's motion to dismiss. ECF No. 132. Specifically, she cites a "Field Service Order" showing that Daimler placed a service call to "FARR/TARTEN" regarding the bus about four months before the crash. ECF Nos. 132 at 1–2, 12–13; 131-1. This Field Service Order is signed by Michael Quinn, who is a manager for Daimler and who is apparently based in Oriskany, New York. ECF Nos. 132 at 1–2, 12–13; 131-3. Plaintiff then cites a Tarten invoice that Tarten directed to a North Carolina branch of Daimler; this invoice shows that Tarten later performed the service work on the bus and replaced certain parts. ECF No. 131-4. The invoice includes the following handwritten notation: "Mike Quinn's Approved signature." *Id.*

Plaintiff's argument thus appears to be as follows: Because Michael Quinn is based in

New York and his signature or "[a]pproved signature"[4] appears in two places—(i) a document showing that Daimler placed a service call to Tarten regarding the bus prior to the crash, and (ii) Tarten's invoice to Daimler for those services—Tarten has sufficient contacts with New York under C.P.L.R. § 302(a)(1). *See id.*

Put simply, this connection to New York is not enough. Turning to the first of the four factors, Plaintiff has failed to assert that Tarten has any sort of ongoing contractual relationship with a New York corporation that gave rise to this cause of action. Above, Plaintiff has merely argued that Tarten made an agreement with a New York-based manager of Daimler. As Plaintiff concedes in the Amended Complaint, however, Daimler is a Canadian corporation. ECF No. 37 at ¶ 1. Accordingly, the contract for services involving Michael Quinn does not even qualify as relationship with a New York corporation, much less an ongoing relationship with a New York corporation. Thus, the first factor does not weigh in favor of jurisdiction over Tarten.[5]

The second factor principally concerns whether the contract was negotiated or executed in New York. Even construing all ambiguities in Plaintiff's favor, it stretches credulity to believe that this contract for services was negotiated in any meaningful way in New York or that it was signed in New York. The best case scenario for Plaintiff and Crossclaimants is that Michael Quinn called Tarten from a New York location requesting that Tarten perform service work on the bus. Tarten then sent the invoice for its services to a North Carolina branch of

---

[4]    Based on this handwritten notation, it seems as though Michael Quinn himself did not actually sign the document, but rather someone else signed the document on his behalf.

[5]    The Court observes that Tarten does appear to have relationships, ongoing or otherwise, with a variety of corporations. The problem for Plaintiff and Crossclaimants is that all of these corporations are foreign. For instance, Plaintiff alleges that Tarten "regularly contracts with" Setra, Daimler, and ZF regarding service work. ECF No. 37 at ¶ 53. Tarten itself also acknowledges that it has received multiple service calls about the bus in question from Daimler and Farr's Coach, and that Tarten is an authorized repairer for ZF Services North America, LLC ("ZFNA"), which is not a party in this action. ECF Nos. 108 at ¶ 17; 147 at 3, 9–10. Setra, Daimler, ZF, Farr's Coach, and ZFNA are all foreign corporations, so Tarten's relationships with them do not weigh in favor of this Court conferring jurisdiction over Tarten.

Daimler, and Michael Quinn signed that invoice.

Once again, this makes for a tenuous connection to New York. New York courts have consistently refused to hold that jurisdiction under C.P.L.R. 302(a)(1) is conferred over a defendant just because the defendant received an order or solicitation from a party in New York. *Fiedler v. First City Nat. Bank of Houston*, 807 F.2d 315, 317 (2d Cir. 1986) (citing *M. Katz & Son Billiard Products, Inc. v. G. Correale & Sons, Inc.*, 285 N.Y.S.2d 871 (1967)). ("[T]he 'order solicitation' cases . . . hold th[at] telephone orders not involving visits or consultations in New York do not confer personal jurisdiction under § 302(a)(1)."). Here, there is nothing indicating that Tarten visited New York at any time for any reason to negotiate or consult with anyone regarding this agreement. Furthermore, there is no allegation that Michael Quinn signed the invoice in New York; Hume has simply alleged that Quinn is based in New York, and his "[a]pproved signature" appears on an invoice that Tarten addressed to a North Carolina branch of Daimler. ECF No. 131-4. These allegations cannot form the basis for a finding that New York was the locale of meaningful contract negotiations or that the contract was executed in New York.

The third and fourth factors in the analysis do not weigh in favor of jurisdiction over Tarten either. As for the third factor, there is no allegation that the parties agreed to resolve disputes under the contract in New York or under New York law. As for the fourth factor, there is no indication that Tarten sent notices or any sort of correspondence regarding payment for its services into New York. As is outlined above, Plaintiff has merely asserted that Tarten sent an invoice for its services to a North Carolina branch of Daimler. Simply stated, there was no transaction of business within New York. Accordingly, Plaintiff and Crossclaimants have not carried their burden in showing that the "transaction of business" prong in C.P.L.R. § 302(a)(1) is satisfied.

Before turning to the "supplying goods or services" prong of Section 302(a)(1), the Court notes that Plaintiff, Farr's Coach, and Bisson have repeatedly referenced Tarten's website in arguing that personal jurisdiction over Tarten exists.  ECF Nos. 120 at ¶¶ 18–28; 131, at ¶¶ 11–13; 132 at 3.  Specifically, these parties focus on a metric showing that Tarten's official website, www.tarten.com, is the 1,507,942nd most-visited website in the United States.  ECF Nos. 120 at ¶¶ 18–28; 131 at ¶¶ 11–13; 132 at 3.  Additionally, Bisson points out that Tarten is listed on a website known as the Used Equipment Network, www.usedequip.com.  ECF No. 127 at ¶ 6.  The argument appears to be that because Tarten's website "has a ranking in the United States" (ECF No. 132 at 3) and because Tarten promotes itself on the Used Equipment Network (ECF No. 127-2, at 3–4), Tarten has contacts in the United States that must at least be probed further in jurisdictional discovery.  ECF No. 132 at 3–4.

To the extent that these parties are arguing that Tarten transacted business within New York as a result of websites that solicited business in New York, that argument fails.  Generally speaking, to determine whether a website constitutes "transacting business" for purposes of personal jurisdiction, courts look at the level of interactivity and the nature of the exchange of information that occurs on a website. *See A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 567 (E.D.N.Y. 2011).  For example, if a website is interactive in that it allows a customer in New York to "chat" in real time with the seller or it allows the customer purchase a good or service directly over the website, a court in New York is more likely to find that the seller is subject to personal jurisdiction. *Iannucci v. Re/Max Antigua Ltd.*, No. 15 CIV. 1964, 2016 WL 206300, at *2 (E.D.N.Y. Jan. 16, 2016).  On the other hand, a "passive" website that essentially just provides visitors with information about the seller or the seller's products will not confer jurisdiction over the seller. *See id.*.

Here, the parties arguing for personal jurisdiction over Tarten have failed to allege that

these websites are interactive websites. Furthermore, based on exhibits in the record that are print-outs of the websites, Tarten's website and the Used Equipment Network website indeed appear to be the type of passive sites that simply provide information about Tarten or Tarten's services. ECF Nos. 120 at 21–24; 127-1. Accordingly, the Court finds that these websites also do not weigh in favor of the notion that Tarten transacted business within New York.

*ii. Supplying Goods or Services*

The Court thus turns to the other prong in Section 302(a)(1), the "supplying goods or services" prong. Under this prong, a defendant is subject to personal jurisdiction if it "contracts anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). The purpose of this prong is to allow for jurisdiction over defendants who may not enter the state, but who nevertheless endeavor to supply goods or services into the state. *Bank Brussels Lambert* 171 F.3d at 789; *Waldorf Associates, Inc. v. Neville*, 533 N.Y.S.2d 182, 185 (Sup. Ct. 1988) *aff'd*, 547 N.Y.S.2d 556 (1st Dep't 1989).

Plaintiff attempts to invoke this prong by analogizing the case at hand to another Western District of New York case, *Iovate Health Scis., Inc. v. Masuda*, No. 08-CV-809, 2009 WL 2878526 (W.D.N.Y. Sept. 2, 2009). In *Iovate*, a resident of the state of Washington sold a variety of health supplements in Washington to wholesale distributors. *Id.* at *1–2. The distributors resold the supplements and, eventually, the supplements ended up in a retail store in Rochester, New York. *Id.* The plaintiffs brought suit against the defendant for patent infringement regarding the supplements, and the plaintiffs asserted that the New York court had jurisdiction over the defendant. *Id.*

The *Iovate* court determined that the plaintiffs had made a sufficient of showing of personal jurisdiction to warrant jurisdictional discovery. *Id.* at *3. In essence, the court found that because the defendant sold goods to an out-of-state distributor who then "introduce[d] the

goods into New York," the defendant itself had potentially transacted to supply goods into New York pursuant to C.P.L.R. § 302(a)(1). *Id.* at \*4 (citation and internal quotations omitted).

There are a variety of problems with analogizing *Iovate* to the case at hand. The first is that Tarten is not supplying *goods* at all. Rather, it is supplying a *service*, namely, it is in the business of repairing transmissions on vehicles. Accordingly, Tarten certainly did not contract to supply goods into New York like the defendant in *Iovate*. Additionally, Tarten did not contract to supply services in New York; it contracted to supply services in Canada. Once again, no party has alleged that the repair took place—or was ever contracted to take place—anywhere other than Tarten's facilities in Canada. Thus, in the words of C.P.L.R. § 302(a)(1), Tarten did not "contract[] . . . to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). In short, Tarten did not contract to supply a good, and it did not contract to supply a service in the state. Accordingly, *Iovate* is inapplicable, and the "supplying goods or services" prong under Section 302(a)(1) is also not satisfied. N.Y. C.P.L.R. § 302(a)(1).

In sum, Plaintiff and Crossclaimants have not carried their burden of showing that C.P.L.R. § 302(a)(1) provides a basis for personal jurisdiction over Tarten.[6]

---

[6]    Bisson has also put forth a curious argument pursuant to C.P.L.R. § 302(a)(1) that Tarten "participate[d] in a concert of action and business scheme to transact business in the State of New York and to provide goods and services in the State of New York." ECF No. 127-2 at 5. More specifically, Bisson appears to argue as follows: Tarten is in a contractual relationship with ZF Services North America, LLC ("ZFNA")—a non-party in this case—where Tarten services buses for ZFNA. ECF No. 127-2 at 4–7; *see also* ECF Nos. 108 at ¶ 17; 147 at 3, 9–10. Tarten knows or should know these buses will be operated in New York. ECF No. 127-2 at 4–7. Thus, Tarten and ZFNA may actually be in an agency relationship that affects New York, and the Court should at least allow Tarten to probe this agency relationship in jurisdictional discovery. ECF No. 127-2 at 4–7.
       Further explanation of this argument is unnecessary because Bisson has (i) failed to say how this purported agency relationship constitutes transacting business within New York, (ii) failed to cite a case that is remotely similar to the case at hand to support it, and (iii) has, more generally, failed to develop it. ECF No. 127-2 at 2–7. The argument is waived because it is undeveloped, though the Court notes that it appears to be entirely without merit. *See Lyn*, 2007 WL 1876502, at \*16 n. 13 ("Issues mentioned in a perfunctory manner, unaccompanied by some

3. *Long-Arm Jurisdiction Pursuant to C.P.L.R. § 302(a)(3)*

Finally, the parties opposing Tarten's motion attempt to invoke C.P.L.R. § 302(a)(3) as a basis for jurisdiction. ECF Nos. 120 at ¶¶ 12–35; 127-2 at 5; 129-4 at 5–8; 132 at 13–17; 136 at 5–6. Section 302(a)(3) allows for jurisdiction over a defendant that "commits a tortious act without the state causing injury to person or property within the state" as long as one of the following two conditions are met: (i) the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [New York]," or (ii) the defendant "expects or should reasonably expect the act to have consequences in [New York] and derives substantial revenue from interstate or international commerce." C.P.L.R. § 302(a)(3). The Court addresses both prongs (i) and (ii) below.

i. *Regularly Does or Solicits Business in New York*

Bisson, Hume, and ZF have all put forth brief arguments as to why Tarten is subject to jurisdiction under C.P.L.R. § 302(a)(3)(i). ECF Nos. 127-2 at 5; 129-4 at 5-6; 132 at 13–14; 136 at 5–6. That is, the parties argue that Tarten has (a) committed a tortious act outside New York that has caused injury inside New York, and (b) that Tarten regularly solicits business in New York, or engages in persistent conduct in New York, or derives substantial revenue from goods used or consumed or services rendered in New York. C.P.L.R. § 302(a)(3)(i).

Plaintiff and Crossclaimants have adequately pled that Tarten performed a negligent repair in Canada that caused injury in New York. Accordingly, the only question here is whether the parties have made a sufficient showing that Tarten has engaged in regular business or otherwise persistent conduct in New York.

The New York Court of Appeals has instructed that Section 302(a)(3)(i), regardless of

---

effort at developed argumentation, are deemed waived.") (citations and internal quotations omitted).

whether the plaintiff seeks to invoke the business, conduct, or revenue component, "necessitates some ongoing activity within New York State." *Ingraham v. Carroll*, 90 N.Y.2d 592, 597 (1997) (emphasis omitted).  This ongoing activity does not "require the quantity of New York contacts that is necessary to obtain general jurisdiction . . . , [but] it does require something more than [a] one shot single business transaction described in C.P.L.R. 302(a)(1)." *Id.* (citations and internal quotations omitted).  In short, the defendant must have "sufficient contacts with this state so that it is not unfair to require them to answer in this state for injuries they cause here by acts done elsewhere." *Id.*; *see, e.g.*, *Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07-CV-2360, 2008 WL 169358, at *5 (S.D.N.Y. Jan. 16, 2008) (finding sufficient contacts where defendant made "systematic visits [to New York], in combination with substantial purchases from New York vendors"); *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 78 (E.D.N.Y. 2006) (finding sufficient contacts where defendant made "regular visits to New York to conduct business" over a period of at least ten years).

Given this standard, Hume, ZF, and Bisson have failed to make a *prima facie* showing that Tarten had the sort of ongoing contact in New York that satisfies C.P.L.R. § 302(a)(3)(i).

Hume bases her Section 302(a)(3)(i) argument on, once again, Michael Quinn, the New York-based employee of Daimler.  ECF Nos. 131 at ¶¶ 5–7; 132 at 13–14.  Hume's argument regarding Michael Quinn is even more specious in this context than it was in the Section 302(a)(1) context: Because Quinn is based in New York and his signature appears in two places—(i) a document showing that Daimler placed a service call to Tarten regarding the bus prior to the crash, and (ii) Tarten's invoice to Daimler for those services—Tarten has engaged in *ongoing, persistent* activity in New York.  *Id.*  The Court previously rejected this argument as even a "one shot" single New York business transaction as described in C.P.L.R. §  302(a)(1). *See supra* Part II.2.i; *Ingraham*, 90 N.Y.2d at 597 (citations and internal quotations omitted).

Thus, it certainly now rejects it as a regular course of business or conduct in New York. The Court reiterates here that Tarten's service call and invoice to Daimler are evidence of, at most, a single agreement by Tarten with a non-New York corporation.

Hume also seeks to invoke C.P.L.R. § 302(a)(3)(i) by making a passing reference to Tarten's website. ECF No. 132 at 13. Once again, the argument is that because Tarten's website "has a ranking in the United States" (ECF No. 132 at 13), Tarten has contacts in the United States that must at least be probed further in jurisdictional discovery. ECF No. 132 at 13. The Court has also already discussed Tarten's website in in the context of C.P.L.R. § 302(a)(1), and the same analysis applies here. *See Richtone Design Grp. L.L.C. v. Classical Pilates, Inc.*, No. 06 CIV. 0547, 2006 WL 2588135, at *2–3 (S.D.N.Y. Aug. 21, 2006). Tarten's website is not an interactive website; rather, it appears to be an entirely passive website that merely endeavors to provide information to visitors about Tarten. *See supra* Part II.2.i. Such a passive website— especially a website that is not at all directed to New York consumers—does not weigh in favor of jurisdiction over Tarten. *See Richtone*, 2006 WL 2588135, at *2–3.

The arguments by Bisson and ZF are also insufficient to invoke C.P.L.R. § 302(a)(1). ZF first points to broad allegations that "Tarten is authorized to do business in the State of New York and does do business within the State of New York." ECF No. 136 at 5. These sorts of conclusory allegations are, plainly, not enough to confer jurisdiction. *See Pitbull Prods., Inc. v. Universal Netmedia, Inc .*, No. 07–cv–1784, 2008 WL 1700196, *7 (S.D.N.Y. Apr.4, 2008) ("[Plaintiff's] (conclusory) allegations [that Defendant regularly solicits business in New York] fail to satisfy CPLR 302(a)(3)(i)."). ZF then notes that Tarten made service calls on the bus prior to the crash, and the bus was "bound for New York." ECF No. 136 at 5. This argument is without merit; the making of service calls for a bus that later ended up in New York does not even qualify as engaging in business in New York. It certainly does not qualify as engaging in

some sort of regular, persistent, or otherwise ongoing business in New York within the meaning of C.P.L.R. § 302(a)(3)(i).

Finally, Bisson makes a curious argument that Tarten participated in a "concert of efforts" with ZF Services North America, LLC ("ZFNA")—a foreign corporation that is not a party to this action—to regularly service buses. ECF No. 127-2 at 5; *see also* ECF Nos. 108 at ¶ 17; 147 at 3, 9–10. According to Bisson, Tarten knew or should have known that these buses would be operated in New York, so Tarten and ZFNA engaged in regular or persistent business in New York. ECF No. 127-2 at 4–7. The Court once again gives short shrift to this argument; the mere fact that Tarten and a contracting party knew or should have known that buses Tarten serviced would end up in New York does not remotely show that Tarten engaged in some sort of ongoing business within New York.

In sum, Plaintiff and Crossclaimants have failed to make a *prima facie* showing that Tarten is subject to jurisdiction under C.P.L.R. § 302(a)(3)(i).

> ii. *Reasonably Expects the Act to Have Consequences in New York and Derives Substantial Revenue from International Commerce*

Thus, the Court turns to the final basis for conferring personal jurisdiction over Tarten, Section 302(a)(3)(ii) of the C.P.L.R. Section 302(a)(3)(ii) provides that a defendant is subject to jurisdiction where it (a) has committed a tortious act outside New York that causes injury inside New York, (b) expects or should reasonably expect that the act will have consequences in New York, and (c) derives substantial revenue from interstate or international commerce. C.P.L.R. § 302(a)(3)(ii).

Once again, Plaintiff and Crossclaimants have adequately pled that Tarten performed a negligent repair in Canada that caused injury in New York. Accordingly, the only questions here are whether Tarten reasonably expected the act to have consequences in New York, and whether Tarten, as a Canadian corporation, derives substantial revenue from international commerce.

As for the first question, courts have emphasized that "the test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than a subjective one." *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 333 (3d Dep't. 1974). The defendant must, in short, be able to objectively foresee that its act will have consequences in New York. *See id.* In addition to foreseeability, there must also be "evidence of a *purposeful New York affiliation*, for example, a discernible effort to directly or indirectly serve the New York market." *Schaadt v. T.W. Kutter, Inc.,* 169 A.D.2d 969, 970 (3d Dep't 1991) (emphasis added). The two components to the reasonable expectation requirement have caused some courts to characterize it as a "foreseeability plus purposeful act" requirement. *Kernan v. Kurz-Hastings, Inc.*, 997 F. Supp. 367, 377 (W.D.N.Y. 1998), *aff'd*, 175 F.3d 236 (2d Cir. 1999). Overall, the Court must determine whether the Defendant purposefully availed itself of the benefits of the laws of New York so that it would reasonably anticipate being haled into a New York court. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999).

The second question is whether the defendant derives substantial revenue from interstate or international commerce. Notably, by the plain text of the provision, the Court is not just assessing here the amount of revenue that Tarten derives from *New York commerce*; it is assessing the amount of revenue that Tarten, as a Canadian corporation, derives from *international commerce. See* C.P.L.R. § 302(a)(3)(ii). The substantial revenue component is meant to "preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character." *Ingraham v. Carroll*, 90 N.Y.2d at 599 (citations and internal quotations omitted); *see also* David D. Siegel, *New York Practice* § 88 (5th ed. 2011) (describing C.P.L.R. § 302(a)(3)(ii) as a "bigness requirement" designed to assure that the defendant is "economically big enough" to defend suit in New York). Determining what level of revenue is "substantial" typically requires

courts to assess what percentage of a defendant's overall revenue it derives from international business. *See Allen*, 45 A.D.2d at 333. Courts may also determine what is "substantial" by looking at the absolute number of the defendant's international revenues. *See Vecchio v. S & T Mfg. Co.*, 601 F. Supp. 55, 58 (E.D.N.Y. 1984). Neither approach is binding and there are no bright-line percentages or numbers that qualify as "substantial;" the court must always make a case-specific determination. *See Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 316–17 (S.D.N.Y. 1986) (citations and internal quotations omitted).

With this mind, the Court turns to the first question—whether Tarten expected or should have reasonably expected that its repair in Canada would have consequences in New York. The parties opposing Tarten's motions build their argument here on the fact that Tarten is located very close to the New York-Canada border. ECF Nos. 120 at ¶ 18; 127 at ¶ 10; 127-2 at 6; 129-4 at 7; 131 at ¶ 13; 132 at 15; 136 at 6. More specifically, Tarten appears to have performed the repair in Mississauga, Ontario at a location about seventy miles from the New York border. *E.g.*, ECF No. 136 at 6; *see also* ECF No. 131-4. As the argument goes, this proximity should have at least put Tarten on notice that its service work might have consequences in New York. *E.g.*, ECF Nos. 127 at ¶ 11; 132 at 15–16.

The parties also point out that the bus Tarten serviced was not a private vehicle for use around town. *E.g.*, ECF Nos. 127 at ¶¶ 11; 132 at 16. Rather, it was a touring bus that would foreseeably be used to transport passengers to nearby tourist attractions such as Niagara Falls and New York City. *Id.* Additionally, the parties note that this touring bus had a United States Department of Transportation ("USDOT") number imprinted on the side of it. *E.g.*, ECF Nos. 131 at ¶ 10; 132 at 17. USDOT numbers are required by the Federal Motor Carrier Safety Administration, an agency within the United States Department of Transportation, to be displayed on all motor carriers traveling interstate in the United States. ECF Nos. 131 at ¶ 11;

131-6. Accordingly, the parties argue that Tarten certainly should have expected that the bus in its shop would travel into the United States via the closest border to Mississauga, the New York state border. *E.g.*, ECF Nos. 131 at ¶ 10; 132 at 16.

The Court agrees with the parties opposing Tarten's motions that Tarten should have reasonably expected that the bus it repaired would travel into New York.   The Court's determination is based on the following concrete facts: (a) Tarten performed the repair very close to the New York border,[7] (b) the bus was a touring bus that would foreseeably be used to carry passengers to nearby tourist attractions in New York, and (c) the bus displayed a USDOT number that indicated it traveled in the United States, and the closest way into the United States was through New York.   Thus, the reasonable expectation or foreseeability component of C.P.L.R. § 302(a)(3)(ii) is satisfied.

As New York courts have made clear, however, reasonable foreseeability that the act will affect New York is not enough.  *Kernan*, 997 F. Supp. at 377; *see Schaadt*, 169 A.D.2d at 970. The full requirement is a "foreseeability plus purposeful act" requirement.  *Kernan*, 997 F. Supp.

---

[7]      Tarten contends that "[i]t is well established" that the defendant's geographic proximity to the forum state is "irrelevant to a jurisdictional analysis." ECF No. 147 at 14–15.  To support this contention, however, Tarten quotes from a Second Circuit case from 1965, which is before the New York long-arm statute even allowed for jurisdiction over a defendant who committed a tortious act outside of New York causing injury inside of New York. *Id*; *Grossman v. Pearlman*, 353 F.2d 284, 286 (2d Cir. 1965); *see also Friedr. Zoellner (New York) Corp. v. Tex Metals Co.*, 396 F.2d 300, 302 (2d Cir. 1968) (observing that C.P.L.R. § 302(a)(3) was enacted in 1966 to fill a gap in New York's long-arm statute).   Clearly, now that the long-arm statute allows for defendants committing out-of-state acts to be subject to jurisdiction if they "reasonably expect" that the act will affect New York, the defendant's location—and more specifically, where the tortious act was committed—may be relevant to the jurisdictional analysis.

Tarten also attempts to support its "geographic proximity is irrelevant" contention with another case involving New York driver who crashed his car in Connecticut. *Williams v. Enter. Rent-A-Car of Boston, Inc.*, 35 A.D.3d 264, 264 (1st Dep't 2006).   The court in *Williams* understandably found that jurisdiction did not exist under C.P.L.R. § 302(a)(3)(ii) as to the defendant rental car company because the crash—*i.e.*, the cause of the plaintiff's injuries— occurred *outside of New York*. *Id*. at 264. Section 302(a)(3) only captures defendants who cause injury *inside of New York*.   Thus, *Williams* stands for a proposition that has no application to the case at hand.

at 377.   Accordingly, the parties opposing Tarten's motions must also show that   Tarten committed some purposeful act, or made some "discernible effort," that affected New York. *Schaadt*, 169 A.D.2d at 970.

On the allegations currently before the Court, they have not done so.   In short, the parties have alleged that Tarten performed a service on a bus in Canada.   They have also alleged that Bisson, an employee of Farr's Coach, then drove the bus into Canada.   However, while these allegations may show that Tarten reasonably expected that the bus would travel to New York, they do not show that *Tarten itself* created a purposeful connection to New York.   Rather, it was *Bisson and Farr's Coach* that created the purposeful connection to New York, and Tarten is simply affiliated with Bisson and Farr's Coach as an aftermarket servicer.   As the Supreme Court has made clear in the context of federal due process, this sort of one-step-removed connection to the forum state does not qualify as purposeful availment:

> [T]he [jurisdictional] relationship must arise out of contacts that the defendant *himself* creates with the forum State. . . . We have consistently rejected attempts to satisfy the defendant-focused minimum contacts inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State. . . . [I]t is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.   To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.

*Walden v. Fiore*, --- U.S. ---, 134 S. Ct. 1115, 1122–23 (2014) (emphasis in original) (internal citations and quotations omitted).   In other words, it is not enough for a defendant to have a relationship with a party that purposefully acts towards New York.   The defendant *itself* must purposefully act towards New York.   Thus, it is not enough for Tarten to have a relationship with Bisson and Farr's Coach where Bisson and Farr's Coach unilaterally drove into New York.

Rather, it must be Tarten itself—more specifically, Tarten's purposeful conduct—that forms the necessary connection to New York.

A brief review of two analogous cases further illustrates this point.  In *Etra v. Matta*, 464 N.Y.S.2d 1001 (1st Dep't 1983), *aff'd*, 61 N.Y.2d 455 (1984), a Massachusetts physician administered a contaminated drug to a patient, and the patient later traveled back into New York where he died.  *Id.* at 1002.  The patient's estate brought a malpractice suit in New York against the patient's local New York doctor, and the local doctor impled the Massachusetts doctor.  *Id.* The court found that personal jurisdiction over the Massachusetts doctor did not exist and made the following simple observation: "[S]tanding alone, [the doctor's] treatment of or hospitalization of a New York resident cannot be deemed a purposeful act by which he availed himself of the privilege of conducting activities here."  *Id.* at 1003.  The same reasoning applies to the case at hand.  Tarten's "treatment" or repair of a bus that traveled into New York does not, on its own, qualify as a purposeful act by which Tarten availed itself of the privilege of conducting activities here.  *Id.*

The second case is *Swift Transp. Co. of Arizona, LLC v. RTL Enterprises, LLC*, No. 1:14-CV-902, 2015 WL 457641 (N.D.N.Y. Feb. 3, 2015).  In *Swift*, two companies contracted with a trucking company to haul asbestos from Connecticut to Ohio.  *Id.* at *1.  The two companies (the "loading companies") were responsible for loading the asbestos into trucks in Connecticut; the trucking company was responsible for driving the asbestos to Ohio.  *Id.*  While the trucking company's drivers were passing through New York, they noticed that asbestos was leaking from the trucks.  *Id.*  The trucking company then spent a considerable amount of money cleaning up the asbestos, and it then sued the loading companies for indemnification.  *Id.*

The New York court found that personal jurisdiction over the loading companies did not exist.  *Id.* at *5.  In sum, while the two loading companies undoubtedly knew that the route from

38

Connecticut to Ohio "required entry into New York," the loading companies had not performed any "affirmative acts" towards New York themselves. *Id.* at *3–4; (citing *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2788 (2011) ("[I]t is not enough that the defendant might have predicted that its goods will reach the forum State.")). Rather, the loading companies were simply affiliated with a party—the trucking company—that had purposefully acted towards New York. *Id.* The same reasoning applies to the case at hand. Tarten is simply affiliated with parties, Bisson and Farr's Coach, that purposefully and unilaterally performed an action that affected New York.

These cases are fundamentally different from the cases that Hume relies on in trying to establish jurisdiction over Tarten, *Crair v. Saxena*, 277 A.D.2d 275 (2d Dep't 2000) and *Adams v. Bodum Inc.*, 208 A.D.2d 450 (1st Dep't 1994). ECF No. 129-4 at 8. In both *Crair* and *Adams*, an out-of-state manufacturer of goods endeavored to distribute its goods nationwide. *Crair*, 277 A.D.2d at 275–76; *Adams*, 208 A.D.2d at 450–51. The goods ended up in New York and injured New York residents. *Id.* In the ensuing lawsuits, the New York courts found that personal jurisdiction existed over the manufacturers. *Id.* This is not a surprising result in light of the standard set forth above—in both *Crair* and *Adams*, the defendant manufacturers purposefully directed the goods, either themselves or through a co-defendant distributor, to New York residents. *Crair*, 277 A.D.2d at 276; *Adams*, 208 A.D.2d at 451. In other words, the manufacturers *affirmatively acted to target New York* with the goods; it was not the "unilateral activity of another party" that caused the goods to end up in New York. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). Thus, the New York courts had personal jurisdiction over the defendants.

All of this is to say that the parties opposing Tarten's motions have failed to make a *prima facie* showing that Tarten purposefully availed itself of New York laws. The Court is

sympathetic, however, to the idea that at the time Tarten filed its motions, the parties had not yet conducted any jurisdictional discovery. ZF in particular was brought into the case only a few months before Tarten filed its motions to dismiss for lack of personal jurisdiction. ECF No. 136 at 2. The Court finds that given the early timing of Tarten's motions, the parties opposing the motions have made a "sufficient start" as to C.P.L.R. § 302(a)(3)(ii) to warrant jurisdictional discovery. *See Peterson v. Spartan Indus., Inc.*, 33 N.Y.2d 463, 467 (1974). More accurately, since jurisdictional discovery is already ongoing, the parties will be given another try after jurisdictional discovery to make a *prima facie* showing that Tarten purposefully availed itself of New York laws. Tarten's motions to dismiss for lack of personal jurisdiction (ECF Nos. 91; 94) are therefore DENIED WITHOUT PREJUDICE.

The Court provides two additional notes on this issue. First, in the event that Tarten renews its motions to dismiss for lack of personal jurisdiction, the Court will consider only one ground of New York long-arm jurisdiction, C.P.L.R § 302(a)(3)(ii). This is because the parties have not made a sufficient showing that any of the other grounds for long-arm jurisdiction exist. So, to be specific, the Court will be looking for factual allegations showing the following: (1) Tarten purposefully availed itself of New York law, and the claims are related to those purposeful acts, and (2) Tarten's international revenue is substantial. Notably, the purposeful availment component requires an analysis under both the long-arm statute and due process.

Also, assuming once again that Tarten refiles its motions, the parties should not rehash old arguments. The Court has already identified the jurisdictionally significant allegations from the current round of briefing. In the next round, it will be looking for new allegations that form a basis for personal jurisdiction over Tarten. So, for instance, numerous parties have attempted to argue that Tarten's website—which is the 1,507,942nd most-visited website in the United States and which attracts less than 300 visitors in the United States per month—somehow creates the

reasonable expectation that its act will affect New York. *See, e.g.*, ECF No. 120 at 20–28. It does not. If anything, Tarten's seldom-visited website is evidence to the Court that Tarten is decidedly *unconnected* to the United States and New York. Similarly, the fact that Tarten's website vaguely notes that Tarten "has attracted the attention of some of the world[']s leading manufacturers" does not at all show that Tarten has relevant contacts with the United States or, more specifically, New York. *Id.* The Court sees no reason to revisit these arguments.

### 4. *ZF's Argument Regarding Tarten's Waiver of Jurisdictional Objections*

Finally, the Court addresses an argument that is uniquely asserted by ZF. In short, ZF argues that Tarten has waived its jurisdictional objection as to ZF's crossclaims against Tarten.

A brief procedural background is necessary to assess this argument. In Tarten's answer to the Amended Complaint, Tarten asserted crossclaims for contribution and indemnification against multiple parties, including ZF. ECF No. 47 at ¶ 39. ZF responded with its own crossclaims for contribution and indemnification against Tarten. ECF No. 58 at ¶¶ 47–49. Tarten answered ZF's crossclaims (ECF No. 66),[8] and now has moved, of course, to dismiss all crossclaims asserted against it, including ZF's crossclaims, for lack of personal jurisdiction (ECF No. 94).

ZF argues that because Tarten asserted crossclaims against ZF before ZF asserted claims against Tarten, Tarten has waived any personal jurisdiction defense it has as to ZF's crossclaims. In other words, "once jurisdiction is invoked, it cannot be denied;" Tarten invoked the Court's jurisdiction by filing crossclaims against ZF, so it cannot now argue that the Court lacks jurisdiction over the crossclaims that ZF filed in return. ECF No. 152 at 1.

---

[8] In Tarten's answer to ZF's crossclaims, Tarten failed to assert the defense of lack of personal jurisdiction. ECF No. 66. Tarten subsequently moved for leave to amend its answer so that it could include, *inter alia*, a personal jurisdiction defense. ECF No. 175. That motion to amend is currently being held in abeyance pending this Decision. ECF No. 196. Because ZF has not specifically argued here that Tarten waived its personal jurisdiction defense by failing to include it in its answer, the Court does not address the argument here.

As ZF points out, there is New York case law that is factually analogous to the case at hand where this argument was also raised. ECF No. 136 at 2–4. In *Bartley v. Reedman*, 86 A.D.2d 820 (1st Dep't 1982), a three-car crash injured the plaintiff, and the plaintiff sued all three drivers. *Id.* at 820. One defendant asserted a crossclaim for "indemnification" against another defendant. *Id.* The second defendant then asserted a mirror-image crossclaim for "indemnification" against the first defendant. *Id.* at 820. Later, the first defendant moved to dismiss the second defendant's crossclaim for lack of personal jurisdiction. *Id.*

The *Bartley* court found that the first defendant had indeed waived its personal jurisdiction defense by "affirmatively [seeking] judgment,"—*i.e.*, asserting the initial crossclaim—against the second defendant. *Id.* at 821. The court's reasoning, however, is critically important to the case at hand.

Key to the reasoning was that the crossclaims were not actually crossclaims for indemnification. *Id.* Rather, the court found that "[i]n the light of the nature of the accident" and the "relationships among the parties," the claims were actually "claims for apportionment of liability based upon the independent negligence, if any, of each of the parties." *Id.* Indemnification claims, on the other hand, are "derivative" claims that essentially allow for one party to be reimbursed if another party is found liable. *See id.* Indemnification claims do not require independent tortious acts by each defendant. *See id.* Thus, even though the defendants had labeled their crossclaims "indemnification" claims, the court looked beyond the pleadings and determined that the defendants were actually just trying to apportion liability for separate torts that led to the crash. *See id.*

The important implication is this: If the crossclaims were truly ones for indemnification, the first defendant *would not have waived* its personal jurisdiction defense by asserting the crossclaim. *See id.* However, because the crossclaims were for apportionment of liability, the

first defendant *did waive* its personal jurisdiction defense by raising the claim. *See id.* The reason, per the *Bartley* court, is that indemnification claims are "derivative" or "secondary" to other claims, so a defendant is not affirmatively invoking the jurisdiction of the court by asserting an indemnification claim. *Id.*

Thus, in the case at hand, this Court also looks beyond the pleadings—which contain boilerplate language as to contribution and indemnification—and attempts to assess the true relationship between Tarten and ZF. Under *Bartley*, if Tarten is seeking to apportion liability with ZF, it has waived any jurisdictional defense it has to ZF's crossclaim. If Tarten is seeking indemnification from ZF, it has not waived its jurisdictional defense.

Unfortunately, it is unclear to the Court based on the facts whether Tarten's crossclaims against ZF are truly ones for apportionment of liability, indemnification, or both within the meaning of *Bartley*. ZF is the manufacturer of the bus's transmission and Tarten is an authorized repairer of ZF transmissions. Accordingly, it is possible that ZF and Tarten have committed independent torts in this case, *e.g.*, ZF negligently manufactured the transmission and Tarten negligently repaired the transmission. It is also possible that there is some sort of indemnification agreement between the parties where, for instance, ZF has agreed to reimburse Tarten if Tarten is found liable in a lawsuit like this one. The Court requires more information regarding the relationship between the parties before definitively ruling on Tarten's possible waiver of its personal jurisdiction defense.

Accordingly, both ZF and Tarten are directed to submit memoranda, not to exceed five pages, describing their positions as far as whether Tarten's crossclaims against ZF are, within the meaning of *Bartley*, ones for apportionment of liability, indemnification, or both. The parties have thirty days from the date of this Decision to submit these memoranda.

## CONCLUSION

For the foregoing reasons, Setra's motion to dismiss (ECF No. 73) is DENIED IN PART AND GRANTED IN PART. Tarten's motions to dismiss for lack of personal jurisdiction (ECF Nos. 91; 94) are DENIED WITHOUT PREJUDICE.

The Court concludes with a few words of caution to the parties. This is a serious case involving the death of an individual. It is also a complicated case involving many parties, many claims, and a myriad of legal issues. The parties have, quite frankly, made it difficult to analyze these legal issues by continually making arguments that are poorly developed and scantily supported by case law. Poorly drafted arguments do a disservice to the Court as well as the clients, and they will not be tolerated from this point forward.

IT IS SO ORDERED.

DATED:      March 8, 2016
            Rochester, New York


HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court