UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHANIE HUME, as Administrator of the
Estate of TIMOTHY HUME a/k/a
TIMOTHY JAMES HUME, Deceased,

                Plaintiff,

   v.

FARR'S COACH LINES, LIMITED et al.,

                Defendants.
_____

DECISION AND ORDER

Case # 12-CV-6378-FPG

## I.     Introduction

      This case arises out of a crash between a coach bus and a tractor-trailer on July 22, 2011 in Junius, New York.  The crash occurred after the driver of the bus pulled over to the side of the road because the bus was experiencing problems with its transmission.  The driver then attempted to merge back onto the highway when a tractor-trailer driven by Timothy Hume crashed into the back of the bus.  Timothy Hume was killed in the crash.  His daughter, Stephanie Hume ("Hume"), brings this suit as administrator on behalf of his estate.

      Hume has asserted claims sounding in negligence, strict products liability, and breach of warranty against a variety of parties including Daimler Buses North America, Ltd. ("D-Ltd.") and Tarten Equipment Limited ("Tarten").  The defendants have also asserted a flurry of related crossclaims against each other.

      D-Ltd. and Tarten now move to dismiss all claims and crossclaims asserted against them for lack of personal jurisdiction.  ECF Nos. 248; 278.  Alternatively, both parties move to dismiss the action on the basis of *forum non conveniens*. *Id.*  These motions are discussed in turn

below.

## II.        D-Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction

A.  <u>Background</u>

D-Ltd. is the seller of the allegedly defective bus, and the claims and crossclaims against it arise out of this sale.  It is a Canadian corporation that is a wholly owned subsidiary of Daimler Buses North America, Inc. ("D-Inc."), which is a New York corporation.  ECF No. 248-5 at ¶¶ 3–4.

As for D-Ltd.'s business, D-Ltd. began winding down in 2012 and "currently [only] honors existing contractual obligations."  ECF No. 248-5 at ¶¶ 5–6.  Prior to 2012, D-Ltd. could be generally described as a manufacturer of bus frame assemblies and distributor of buses to Canadian buyers.  ECF No. 248-7 at 3–5.  Specifically, D-Ltd.'s business involved three types of buses: Orion transit buses, Sprinter buses, and coach buses.  ECF No. 248-7 at 3–5.

An Orion transit bus is a city or county transit bus designed for sale to public transit authorities.  ECF No. 248-5 at ¶ 8.  D-Ltd. would manufacture Orion frame assemblies and sell the assemblies to D-Inc.  *Id.* at ¶ 6.  D-Inc. would then assemble the bus and sell the completed bus back to D-Ltd.  *Id.* at ¶ 7.  Finally, D-Ltd. would sell the Orion buses to public transit authorities in Canada.  *Id.*  Starting in 2010, D-Ltd. would also sell Orion buses back to D-Inc. that D-Inc. would then sell in the United States and Puerto Rico.  *Id.*

A Sprinter bus a hotel shuttle bus.  *Id.* at ¶ 6.  From 2008 to 2010, D-Ltd. would buy Sprinter buses from a Daimler affiliate based in the United States and then sell the buses in Canada.  *Id.*  For about one year, D-Ltd. also did some assembly of Sprinter buses.  *Id.*

Finally, a coach bus is a touring bus designed for longer trips.  *Id.* at ¶ 8.  It was the type of bus involved in the crash that precipitated this lawsuit.  D-Ltd. would buy coach buses from

Setra of North America Inc. ("Setra"),[1] another subsidiary of D-Inc., and it would then sell the coach buses in Canada.  *Id.* at ¶¶ 6–9; ECF Nos. 248-7 at ¶ 5–6; 254 at ¶ 16.

With this background of D-Ltd.'s business in mind, the Court turns to the facts underlying the key issue: D-Ltd.'s contacts with New York.  In short, D-Ltd. asserts in its motion that it has essentially no contacts with New York—it is simply a Canadian corporation that manufactures frame assemblies in Canada and sells buses in Canada.  Moreover, D-Ltd. asserts that it has never owned or leased any real property in New York, it has never had any offices or operations in New York, it has never had any bank accounts in New York, it has never stationed any employees in New York, it has never paid taxes in New York, and it has not authorized anyone in New York to accept service of process.  ECF No. 248-5 at ¶¶ 10–12.  In general, D-Ltd. asserts that it is "not qualified, licensed, or authorized to do business in New York."  *Id.* at ¶ 11.

D-Ltd. does, however, have a close relationship with D-Inc., its New York-based parent. According to the parties opposing D-Ltd.'s motion, this close relationship forms the primary basis for personal jurisdiction in a New York court.  ECF Nos. 253-3 at 11–13; 254 at ¶¶ 15–41. Thus, the remainder of this background section is devoted to laying out the contours of the relationship between D-Ltd. and D-Inc.

First, D-Ltd. and D-Inc. provided various "shared services" to each other as set forth in an agreement between the two known as the "Agreement on Intra-Group Services."  ECF No. 252-5.  This agreement was put in writing in 2010, though apparently D-Ltd. and D-Inc. were providing these services to each other since 2003.  ECF No. 248-5 at ¶ 19.  The shared services are specifically listed in "Appendix A" to the agreement.  ECF No. 252-5 at 12–13.  Appendix A is transcribed in full below.  To summarize, Appendix A lays out in four numbered subsections

---

[1]     Setra is also a defendant in this case.

(1) the services D-Ltd. will provide D-Inc.; (2) the services D-Inc. will provide in return to D-Ltd.; (3) a provision regarding service fees for any costs incurred; and (4) a provision requiring the parties to, among other things, give each other estimates of the annual costs of providing the services:

---

**APPENDIX A**
**LIST OF SERVICES AND FEES**

1. [D-Ltd.] agrees to provide [D-Inc.] with the following services:
   a. Finance services.
      i. Processing of accounts receivable, including collection of amounts owing to [D-Inc.].
      ii. Processing of accounts payable, employee expense accounts and issuance of cheques or wire transfers.
      iii. Management and ongoing maintenance of all bank accounts.
      iv. Negotiation of credit lines with Daimler affiliates.
      v. Preparation of monthly quarterly and annual financial statements and related account reconciliations.
      vi. Forecasting and budgeting
   b. Information Technology
      i. Maintenance of software for MRP and financial systems.
      ii. Development and enforcement of overall computer and hardware standards.
      iii. Manage and develop software enhancements and purchase of software.
   c. Sales
      i. Preparation of bid material for competitive bids.
      ii. Assist, as required, in contract management of successful bids.
   d. Purchasing
      i. Product sourcing and buying activities, as required.
   e. Customer Services
      i. Development of service manuals and training material.
      ii. Warranty claim processing.
   f. Legal Affairs
      i. Preparation and review of contracts, as required.
2. [D-Inc.] agrees to provide [D-Ltd.] with the following services:
   a. Engineering
      i. Bid support including preparation of pricing estimates
   b. Administration
      i. Support for the engineering department
   c. Corporate
      i. Corporate strategy for the entire North American operations
3. A service fee of 5% shall be charged on the costs incurred on behalf of the other party.
4. The parties agree to provide an estimate [of] the annual costs to be incurred to provide the services as described and to pay a monthly amount equal to 1/12 of that estimate on

---

> the same terms as outline in Paragraph 5 of the [Agreement on Intra-Group Services] above.  The parties further agree to pay any adjustments to that estimate as may be required within 90 days after the end of the accounting year.

The parties opposing D-Ltd.'s motion place particular emphasis on the first numbered section in Appendix A, which lists the services that D-Ltd. will provide D-Inc.  In short, the parties argue that D-Inc. delegated such an array of duties to D-Ltd., and it did so in such broad terms, that D-Inc. and D-Ltd. became essentially the same corporation.  *E.g.*, ECF No. 253-3 at 6–7, 11–13.  Specifically, D-Inc. delegated to D-Ltd. all accounts receivable and payable functions, meaning essentially that D-Ltd. was responsible for paying off D-Inc.'s creditors and collecting money from D-Inc.'s debtors.  ECF No. 252-5 at 12–13.  In extraordinarily generalized language, D-Inc. also delegated to D-Ltd. the "[m]anagement and ongoing maintenance of all bank accounts" as well as "[f]orecasting and budgeting."  *Id.*  Appendix A will be analyzed in detail later on, but the basic assertion by the opposing parties is that this is not the type of agreement that would exist between two separate corporations.

Additionally, the second numbered section in Appendix A provides that D-Inc. will set the "[c]orporate strategy for the entire North American operations."  *Id.*  In other words, D-Inc. set the corporate strategy for D-Ltd.  The opposing parties argue that this further shows that D-Ltd. and D-Inc. are not actually separate corporations, but rather, D-Ltd. is a branch or department of D-Inc.  *E.g.*, ECF No. 254 at ¶¶ 27–29.  The idea that D-Ltd. is simply a branch of D-Inc. is bolstered by an environmental report prepared by D-Inc.'s parent, Daimler AG, which refers to D-Ltd. as D-Inc.'s "Mississauga plant."  ECF Nos. 253 at ¶ 23; 255-4 at 24.  In a similar vein, D-Inc. apparently used D-Ltd.'s Canada address when corresponding with companies that were bidding on buses.  ECF No. 248-5 at ¶ 19.

The relationship between D-Inc. and D-Ltd. is also illuminated by the commonality of

their leadership.  With regard to the companies' boards of directors, the opposing parties point

out that D-Ltd. has had seven directors since its incorporation in late 2002.  ECF Nos. 252-4.  Of

those seven directors, five were also either directors or officers of D-Inc.  *Id.*  Notably, the two

independent directors retired from D-Ltd.'s board in early 2004, so for the majority of D-Ltd.'s

corporate existence, its entire board of directors has been comprised of people who were also

officers or directors of D-Inc.  *Id.*

With regard to the companies' officers, D-Ltd. has had twenty-one officers since its

incorporation in late 2002.  Of those twenty-one officers, nineteen were also officers of D-Inc.

*Id.*  Notably, the two independent officers are the same two people referenced above as

independent directors, and they also retired as officers in early 2004.  *Id.*  So again, for the

majority of D-Ltd.'s corporate existence, all of its officers have also been officers of D-Inc.  *Id.*

Additionally, with only two minor exceptions,[2] all of these nineteen officers had the exact same

job title at both D-Inc. and D-Ltd., *e.g.*, the "Chief Commercial Officer" of D-Ltd. was also the

"Chief Commercial Officer" of D-Inc.  The general idea here is that, at least circumstantially, D-

Ltd. officers were never really stepping out of their roles as D-Inc. officers.

Lastly, the transaction that ultimately brought D-Ltd. into this case—D-Ltd.'s sale of the

coach bus in question—sheds further light on the relationship between D-Inc. and D-Ltd.  D-Ltd.

sold the bus in 2008 to Wells Fargo Equipment Finance ("Wells Fargo"), a Canadian company.

ECF No. 248-5 at ¶¶ 20–22.  Wells Fargo wanted to pay D-Ltd., however, in U.S. dollars as

opposed to Canadian dollars.  *Id.* at ¶ 21.  Accordingly, Wells Fargo first transferred the funds to

one of its affiliated bank entities in New York.  *Id.*  That entity then transferred the funds to *D-

Inc.'s bank account* in New York.  *Id.*  Through a "reconciliation process," D-Inc. then credited

---

[2]        D-Ltd. deemed one of its officers "Vice President" while D-Inc. deemed the same person
"Vice President – Tax."   Additionally, D-Ltd. deemed one of its officers "Vice President Sales &
Marketing" while D-Inc. deemed the same person "Director, Sales."  *Id.*

those funds to D-Ltd.  *Id.*  The essential takeaway here is that D-Ltd. used D-Inc.'s bank account to actually receive the funds for the bus in question.  Importantly, D-Ltd. used this exact same process to sell eight other buses.  *Id.* at ¶ 22.  The opposing parties assert that D-Ltd.'s use of D-Inc.'s bank account to conduct bus sales further shows that the corporations were not actually separate from each other.

Based principally on the facts above, the parties opposing D-Ltd.'s motion assert that D-Ltd. and D-Inc. are essentially the same corporation, and since D-Inc. is a New York corporation, this Court has jurisdiction over D-Ltd.

As a final background note, prior to filing the present motion, D-Ltd. filed a series of similar motions to dismiss for lack of personal jurisdiction.  ECF Nos. 52; 72; 82; 93; 101; 116; 198.  The Court denied these motions without prejudice and authorized D-Ltd. to file another motion after conducting jurisdictional discovery.  *Hume v. Farr's Coach Lines, Ltd.*, No. 12-CV-6378-FPG, 2015 WL 5773632, at *10 (W.D.N.Y. Sept. 30, 2015) [hereinafter *Hume I,* 2015 WL 5773632].  That discovery has now occurred, and the present motion is D-Ltd.'s renewed motion to dismiss for lack of personal jurisdiction.  ECF No. 248.

B.  Legal Standard

When a defendant files a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff carries the burden of showing that jurisdiction over the defendant exists.  *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) (citations omitted).  As a general rule, "the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction."  *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990).

Here, the Court has allowed the parties to conduct jurisdictional discovery.  Accordingly,

the *prima facie* showing must be "factually supported," *i.e.*, the plaintiff must further "include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.*  In its motion to dismiss, the moving party is then limited to "assum[ing] the truth of the plaintiff's factual allegations . . . and challeng[ing] their sufficiency." *Id.*

This Court sits in diversity jurisdiction in the state of New York, so it exercises personal jurisdiction over the parties in accordance with the law of New York.  *See DiStefano v. Carozzi North Am., Inc.,* 286 F.3d 81, 84 (2d Cir. 2001).  New York courts typically follow two steps in analyzing personal jurisdiction.  First, they determine whether jurisdiction lies pursuant to New York state law, and second, they determine whether jurisdiction comports with the requirements of federal due process.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 357 (S.D.N.Y. 2004).  Here, however, the analysis is slightly altered because the principal argument put forth by the plaintiff and crossclaimants is that the foreign defendant, D-Ltd., is the alter ego of a New York corporation, D-Inc.  In such a case, the jurisdictional analysis conflates into one step—if the Court finds that D-Ltd. and D-Inc. are alter egos under New York state law, it also necessarily finds that jurisdiction comports with federal due process.  *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).

In determining whether entities are alter egos or mere departments of each other, courts closely examine the relationship between the two entities.  *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 712 F. Supp. 2d 104, 110 (S.D.N.Y. 2010) (citations omitted).  In general, entities are alter egos when  one entity so pervasively controls the other "that the corporate separation is more formal than real."  *H. Heller & Co. v. Novacor Chemicals Ltd.*, 726 F. Supp. 49, 54 (S.D.N.Y. 1988), *aff'd sub nom. Heller & Co. v. Novacor*, 875 F.2d 856 (2d Cir. 1989).

The Court also observes, however, that "[e]stablishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." *Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 CIV. 13157 GEL, 2006 WL 3735657, at *13 n.8 (S.D.N.Y. Dec. 15, 2006).

The test for whether two entities are alter egos consists of four factors. The first factor is really a threshold requirement; the entities must have "nearly identical ownership interests." *Beech,* 751 F.2d at 120. Here, D-Ltd. is wholly owned by D-Inc., so that threshold requirement is met.

The remaining three factors are, generally speaking, the subsidiary's financial dependency on the parent, the degree to which the parent and subsidiary observe corporate formalities, and the parent's control over the subsidiary's operational policies. *See id.* at 120–22. No one factor is dispositive. *See id.* They are each analyzed below.

C. Discussion

1. *Financial dependency*

The first factor to consider is whether D-Ltd. is financially dependent on D-Inc. Stated simply, this factor cuts in favor of deeming the parent and subsidiary alter egos if the subsidiary "cannot run its businesses without the financial backing of its parent." *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 410 (S.D.N.Y. 2002). So, for instance, courts look for whether the "parent provides no- or low-interest loans to the subsidiary or extends credit on terms not otherwise available, guarantees the subsidiary's obligations, or provides and pays for insurance coverage or other necessities on behalf of the subsidiary . . . and whether the subsidiary retains its own profits or whether they are received by and reported on the financial statements of the parent." *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese*

*Sudameries*, No. 03 CIV. 1681(LAP), 2004 WL 2199547, at *10 (S.D.N.Y. Sept. 29, 2004) (internal quotations and citations omitted).

Here, the parties opposing D-Ltd.'s motion have only briefly attempted to set forth facts that satisfy this factor.  First, they point out that D-Ltd., Setra (again, another D-Inc. subsidiary), and D-Inc. combined all of their sales of coach buses on financial reports prepared for Daimler AG, which is D-Inc.'s parent.  ECF Nos. 252-14 at 9; 252-3 at 73–76; 253 at ¶ 18.

In the Court's view, this fact is not particularly significant.  First, the opposing parties are not saying that D-Ltd. reported its *profits* on the financial statements of Daimler AG.  Rather, they are simply saying that D-Ltd. reported the *sales of one of the three types of buses* it sold on the financial statements of Daimler AG.  Second, the parties are not even asserting that D-Ltd. reported these sales on the financial statements of *D-Inc.*  Rather, they are asserting that D-Ltd. reported these sales on financial statements of *D-Inc.'s parent*, Daimler AG.  Given that the inquiry here is specifically whether D-Ltd. was financially dependent on D-Inc., the fact that D-Ltd. reported certain sales to D-Inc.'s parent is not especially relevant.

Additionally, one opposing party asserts in conclusory fashion that "the substantial records disclosed from [D-Ltd.] showed that [D-Ltd.'s] business was substantially dependent upon revenues from sales and services with [D-Inc.]."  ECF No. 253-3 at 12–13.  This assertion is unspecific and without citation, so the Court need not accept it as true.[3]

In sum, the first factor of the alter-ego test is not satisfied.

*2. Corporate Formalities*

The next factor of the alter-ego test is the degree to which the parent "fails to observe corporate formalities" and "interferes in the selection and assignment of the subsidiary's

---

[3]     To the extent the assertion simply means that D-Ltd. relied on D-Inc. as its primary supplier of buses, that does not support the idea that D-Ltd. was *financially dependent* on D-Inc.  It simply supports the idea that D-Inc. and D-Ltd. have a supplier-distributor relationship.

executive personnel." *Beech,* 751 F.2d at 121.  In examining this factor, courts typically look for whether the parent and subsidiary hold separate board meetings, maintain separate books and records, share officers and directors, and whether the parent appoints the subsidiary's officers or pays those officers' salaries.  *Allojet PLC v. Vantgage Associates*, No. 04 CIV. 05223 (SAS), 2005 WL 612848, at *9 (S.D.N.Y. Mar. 15, 2005); *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 143 (E.D.N.Y. 2009); *Beech*, 751 F.2d at 121–22.

The Court observes at the outset that D-Ltd. states that the corporate boundary between D-Ltd. and D-Inc. is intact and respected.  D-Ltd. asserts that D-Ltd. and D-Inc. have separate employees, bank accounts, board meetings, payrolls, information technology departments, and human resources departments.  ECF No. 248-5 at ¶¶ 16–17.

The opposing parties primarily make three points to try to establish that D-Ltd. and D-Inc. do not respect corporate boundaries.  First, the parties place particular emphasis on the Agreement on Intra-Group Services, which again is an agreement between D-Inc. and D-Ltd. regarding various services they will provide each other.  Appendix A to the agreement, set forth in full in the background section, lists the exchanged services.  *See supra* Part II.A.  The argument by the opposing parties is that the agreement evidences such a delegation of duties from D-Inc. to D-Ltd., and it does so in such broad terms, that the entities are essentially the same.

This argument is persuasive.  As an initial matter, the Court takes note of the name of the agreement, the "Agreement on Intra-Group Services."  The prefix "intra" here implies at least a tacit understanding between D-Ltd. and D-Inc. that the shared services are flowing back and forth within one single group.

The plain language of Appendix A supports this idea.  In short, D-Ltd. has agreed to

provide D-Inc. with an extraordinary amount of services across a range of platforms. Some of these services are as follows: "Processing of accounts receivable;" "[p]rocessing of accounts payable" including the "issuance of cheques and wire transfers;" "[m]anagement and ongoing maintenance of all bank accounts;" "[f]orecasting and budgeting;" "[d]evelopment and enforcement of overall computer and hardware standards;" "[a]ssist as required, in contract management of successful bids;" "[p]roduct sourcing and buying activities, as required;" and "[p]reparation and review of contracts, as required." ECF No. 252-5.

Based on Appendix A, there is little doubt that D-Ltd. plays a hands-on role in a wide range of D-Inc.'s day-to-day affairs. What is particularly striking about Appendix A, however, is not simply the range of services that D-Ltd. agreed to provide D-Inc. Rather, it is the terms in which D-Ltd. agreed to provide those services. In broad, imprecise, unqualified language, D-Inc. authorized D-Ltd. to, for instance, issue checks, manage bank accounts, forecast and budget, and prepare contracts. The Court does not believe D-Inc. would have delegated this type of blank-check authority over and over again to another entity unless it completely trusted that entity to act in D-Inc.'s own best interests. In other words, the language of the agreement belies any sort of idea that the entities are operating at an arms length.

Additionally, in arguing that D-Ltd. and D-Inc. do not respect corporate boundaries, the opposing parties highlight the degree to which D-Ltd. and D-Inc. share directors and officers. The Court recognizes up front here that "overlapping officers and directors are intrinsic to the parent-subsidiary relationship, and that they are not determinative as to whether the subsidiary is a mere department of the parent." *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (internal quotations and citations omitted).

Here, however, it would be a substantial underestimation to simply characterize the

12

leadership of D-Ltd. and D-Inc. as "overlapping."  In short, save for two individuals who served as both directors and officers of D-Ltd. from late 2002 to early 2004, every single one of D-Ltd.'s directors and officers were also either directors or officers of D-Inc.  ECF No. 252-4.  To be specific, throughout D-Ltd.'s corporate existence, five of its seven directors were also directors or officers of D-Inc..   Additionally, nineteen of its twenty-one officers were also officers of D-Inc.  *Id.*

With regard to D-Ltd.'s officers in particular, a close examination of lists that include each officer's job title, start date, and end date at D-Ltd. and D-Inc. is revealing.  *Id.*  Of the nineteen officers that D-Ltd. and D-Inc. have had in common, all of them have had the same job title at both corporations.[4]  For instance, the Chief Commercial Officer at D-Ltd. was also the Chief Commercial Officer at D-Inc.  *Id.*  Moreover, when officers would retire or change over at D-Ltd., they would also, almost without exception, retire or change over at the same time from D-Inc.  So, for instance, D-Ltd.'s first Secretary was in office from 2004 to 2013, and he was also the Secretary of D-Inc. during the same time period; D-Ltd.'s second Secretary was then in office from 2013 to 2015, and he was also the Secretary of D-Inc. during the same period; D-Ltd.'s third Secretary was in office from 2015 to the present, and he has also been D-Inc.'s Secretary of during the same period.  *Id.*  With only minor variations, this clockwork-like synchronization holds for every one of  D-Ltd.'s officers—Chief Executive Officer, Chief Financial Officer, Treasurer, Chief Commercial Officer, Assistant Treasurer, etc.  *Id.*  Even minor job title changes would take place across both corporations—when the "Chief Financial Officer and Treasurer" for D-Ltd. changed job titles to simply the "Chief Financial Officer," he underwent the exact same job title change at the same time at D-Inc.  *Id.*  The basic idea here is that, based on lists of officers of D-Ltd. and D-Inc., the officers of D-Ltd. were never really

---

[4]       There are two minor exceptions to this rule.  *See supra* note 2 and accompanying text.

changing out of their D-Inc. hats.

Finally, the Court turns to the sale of the coach bus at issue.  The transaction took place as follows: D-Ltd. contracted to sell the bus to Wells Fargo, a Canadian company, which wanted to pay D-Ltd. in U.S. dollars.  ECF No. 248-5 at ¶¶ 20–22.  Accordingly, Wells Fargo first transferred the funds to one of its affiliated bank entities in New York.  *Id.*  Critically, since D-Ltd. does not maintain a bank account in New York, that affiliated entity then transferred the funds to *D-Inc.'s bank account* in New York.  *Id.*  Through a "reconciliation process," D-Inc. credited those funds to D-Ltd.  *Id.*  D-Ltd. used this exact same process to sell eight other buses. *Id.* at ¶ 22.

These transactions are further evidence that D-Inc. and D-Ltd. were not respectful of each other's corporate boundaries.  In short, D-Inc.'s bank account was D-Ltd.'s bank account—even outside companies understood that a deposit into D-Inc.'s account was effectively a deposit into D-Ltd.'s account.

In sum, based on the extensive "shared services" provided by D-Ltd. to D-Inc. via the Agreement on Intra-Group Services, the commonality in corporate leadership between D-Inc. and D-Ltd., and the fact that D-Ltd. used D-Inc.'s bank account to facilitate the transaction of the bus at issue, the Court finds that D-Ltd. and D-Inc. generally did not observe corporate formalities.  Accordingly, the second factor weighs in favor of deeming D-Ltd. and D-Inc. alter egos.

### 3. Control Over Operational Policies

The final factor is the "degree of control over the marketing and operational policies of the subsidiary exercised by the parent."  *Beech,* 751 F.2d at 122.  So, for instance, courts commonly look for whether the parent determines policy without interference by the subsidiary,

runs the subsidiary's day-to-day affairs, and refers to the subsidiary as a branch or department. *See id.*; *Linde*, 262 F.R.D. at 144; *NovelAire Techs., L.L.C. v. Munters AB*, No. 13 CIV. 472 CM, 2013 WL 6182938, at *9 (S.D.N.Y. Nov. 21, 2013).

Here, the Court turns back to the Agreement on Intra-Group Services.  Appendix A provides that D-Inc. will set the "[c]orporate strategy for the entire North American operations." ECF No. 252-5 at 12–13.  In other words, D-Inc. determined the policy for D-Ltd.  Standing alone, this is not a particularly important fact—it is well established that a parent "may make broad policy decisions for its subsidiaries" and such control "does not justify labeling a subsidiary a 'mere department' of the parent." *Palmieri v. Estefan*, 793 F. Supp. 1182, 1189 (S.D.N.Y. 1992).

Of greater importance is D-Inc.'s delegation of its day-to-day affairs to D-Ltd.[5]  In the prior subsection, the Court focused on the unqualified nature of the language of Appendix A; here, it focuses more straightforwardly on the comprehensive array of duties that D-Inc. has delegated to D-Inc.  In short, Appendix A shows that, in many ways, D-Ltd. exists to run D-Inc.'s day-to-day affairs.  Once again, D-Inc. authorized D-Ltd. to, among other things, perform its accounting functions, issue checks, manage bank accounts, negotiate credit lines, prepare financial statements, forecast and budget, maintain computer software, prepare bid material for competitive bids, conduct product sourcing, process warranty claims, and prepare and review contracts.  ECF No. 252-5 at 12–13.  Simply stated, in terms of D-Inc.'s day-to-day affairs, the line between D-Inc. and D-Ltd. appears to be especially hazy.

---

[5]    The Court observes that this case is somewhat different than the usual mere department or alter ego case—here, there is no argument that the parent *controls* the day-to-day affairs of its subsidiary, rather the argument is that the parent is *giving up control* of its own day-to-day affairs to its subsidiary.  This distinction is, however, irrelevant to the analysis given that the goal is simply to determine whether D-Ltd. and D-Inc. are effectively the same corporation for purposes of jurisdiction.

In further support of the satisfaction of the third factor, the opposing parties point to two facts that allegedly show that D-Inc. considers D-Ltd. its branch or department. First, an environmental report prepared by D-Inc.'s parent, Daimler AG, refers to D-Ltd. as D-Inc.'s "Mississauga plant." 255-4 at 24. Additionally, D-Inc. apparently used D-Ltd.'s Canada address when corresponding with companies that were bidding on buses. ECF No. 248-5 at ¶ 19. The Court agrees with the opposing parties that these facts supplement the idea that D-Inc. simply does not regard D-Ltd. as a separate enterprise.

In sum, the Court finds that the final factor in the analysis also cuts in favor of deeming D-Inc. and D-Ltd. alter egos for jurisdictional purposes.

Given that three of the four factors weigh in favor of finding D-Ltd. to be the alter ego of its New York-based parent, D-Inc., the Court finds that it does have personal jurisdiction over D-Ltd. Accordingly, D-Ltd.'s motion to dismiss for lack of personal jurisdiction (ECF No. 248) is DENIED.

### III.    Tarten's Motion to Dismiss for Lack of Personal Jurisdiction

A. Background

According to the Amended Complaint, Tarten is the shop that negligently repaired the bus's transmission prior to the crash. ECF No. 37 at ¶¶ 45, 54–55, 62, 66. Tarten performed the repair in Canada. Shortly after the repair, on July 21, 2011, Rene Bisson ("Bisson"), a driver for Farr's Coach Lines Limited ("Farr's Coach"), drove the bus from Canada into New York state with a number of passengers on board. Around Junius, New York, the bus experienced problems with its transmission and Bisson pulled over to the side of the road. When Bisson then attempted to merge back onto the highway—at this point in the early morning of July 22, 2011—Timothy Hume crashed into the back of the bus.

In terms of personal jurisdiction, Tarten asserts that it has no significant contacts with New York—it is simply a Canadian corporation that performed a repair in Canada.  Moreover, it asserts that it does not perform repairs of vehicles in New York, it is not authorized to do business in New York, it does not maintain offices in New York, it does not have any New York bank accounts, it does not pay taxes to New York, and it does not lease, own, or possess property in New York.  ECF No. 91-1 at 4–5.

Notably, prior to filing the present motion, Tarten filed two motions to dismiss all of the claims and crossclaims asserted against it for lack of personal jurisdiction.  ECF Nos. 91; 94.  In a decision issued March 8, 2016, the Court denied these motions without prejudice, authorizing Tarten to file another motion after conducting jurisdictional discovery.  *Hume v. Lines*, No. 12-CV-6378-FPG-JWF, 2016 WL 1031320, at *21 (W.D.N.Y. Mar. 8, 2016) [hereinafter *Hume II*, 2016 WL 1031320].  That discovery has now occurred, and the present motion is Tarten's renewed motion to dismiss for lack of personal jurisdiction.  ECF No. 278.

In its March 8, 2016 decision, the Court provided specific instructions to the parties asserting that personal jurisdiction exists over Tarten.  Those instructions are set forth below along with the relevant legal standard.

## B.  Prior Decision and Legal Standard

This Court exercises personal jurisdiction over the parties in accordance with the law of New York.  *See supra* Part II.B.  New York courts generally follow two steps in analyzing personal jurisdiction.  *See id.*  First, they determine whether jurisdiction lies pursuant to New York state law, and second, they determine whether jurisdiction comports with the requirements of federal due process.  *See id.*

Here, in its March 8, 2016 decision, the Court already flatly denied that various grounds

of personal jurisdiction exist over Tarten. *Hume II*, 2016 WL 1031320, at *9–21. It stated that upon Tarten's renewed motion, it would consider only one ground of jurisdiction. *Id.* at *21. That ground is set forth in Section 302(a)(3) of the New York Civil Practice Law and Rules ("C.P.L.R."). *Hume II*, 2016 WL 1031320, at *21. Section 302(a)(3) allows a court to exercise jurisdiction over a defendant that "commits a tortious act without the state causing injury to person or property within the state" as long as one of the following two conditions are met: (i) the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [New York]," or (ii) the defendant "expects or should reasonably expect the act to have consequences in [New York] and derives substantial revenue from interstate or international commerce." C.P.L.R. § 302(a)(3). The Court even further limited the parties to subsection (ii), which, simply stated, establishes a ground for jurisdiction over parties that commit tortious acts outside the state while both reasonably expecting that such acts will cause injury inside the state and deriving revenue from international commerce. *Hume II*, 2016 WL 1031320, at *21.

The Court went on to observe that New York courts have actually read in a requirement to § 302(a)(3)(ii) so that the provision accords with federal due process. *Hume II*, 2016 WL 1031320, at *18. Federal due process only allows courts to exercise jurisdiction over a defendant that "*purposefully avails* itself of the privilege of conducting activities within the forum State" (*McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877 (2011) (emphasis added)); thus, New York courts similarly require "evidence of a *purposeful New York affiliation*, for example, a discernible effort to directly or indirectly serve the New York market" (*Schaadt v. T. W. Kutter, Inc.*, 169 A.D.2d 969, 970 (3d Dep't 1991) (emphasis added)). The following passage is how the Court described the concept of purposeful availment in the context of § 302(a)(3)(ii).

More importantly, this passage sets forth why the parties opposing Tarten had, at the time of the March 8, 2016 decision, failed in showing that Tarten purposefully availed itself of, *i.e.* acted towards, New York:

> As New York courts have made clear, . . . reasonable foreseeability that the act will affect New York is not enough [to satisfy § 302(a)(3)(ii)]. *Kernan*, 997 F. Supp. at 377; *see Schaadt*, 169 A.D.2d at 970.  The full requirement is a "foreseeability plus purposeful act" requirement.  *Kernan*, 997 F. Supp. at 377.  Accordingly, the parties opposing Tarten's motions must also show that  Tarten committed some purposeful act, or made some "discernible effort," that affected New York.  *Schaadt*, 169 A.D.2d at 970.
>
> On the allegations currently before the Court, they have not done so.  In short, the parties have alleged that Tarten performed a service on a bus in Canada.  They have also alleged that Bisson, an employee of Farr's Coach, then drove the bus into Canada.  However, while these allegations may show that Tarten reasonably expected that the bus would travel to New York, they do not show that *Tarten itself* created a purposeful connection to New York.  Rather, it was *Bisson and Farr's Coach* that created the purposeful connection to New York, and Tarten is simply affiliated with Bisson and Farr's Coach as an aftermarket servicer.
>
> As the Supreme Court has made clear in the context of federal due process, this sort of one-step-removed connection to the forum state does not qualify as purposeful availment[.]

*Hume II,* 2016 WL 1031320, at *19 (emphasis in original).

The basic idea here was that the parties had failed in showing that Tarten purposefully acted towards New York.  They had merely shown that Tarten was "one-step-removed" from purposefully acting towards New York; specifically, Tarten serviced a bus, and then an entirely separate party—Bisson—*unilaterally drove that bus into New York* thereby creating Tarten's connection with New York.  The Supreme Court has made clear that such an indirect connection is simply not enough to support a finding of personal jurisdiction over a foreign defendant.  *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the

forum State.").

The Court, however, allowed the parties "another try after jurisdictional discovery to make a *prima facie* showing that Tarten purposefully availed itself of New York laws." *Id.* at 21. That of course is the present posture of this case with respect to Tarten.

Two additional notes must be made before turning to the new facts uncovered during jurisdictional discovery.   First, this entire discussion takes place in the context of specific jurisdiction as opposed to general jurisdiction.[6]  Specific jurisdiction exists when the defendant's purposeful act towards New York that forms the basis for jurisdiction is also the act that gives rise to the dispute.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 ("It has been said that when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising 'specific jurisdiction' over the defendant.").  In simple terms, it is not enough for the parties opposing Tarten to show that Tarten purposefully acted towards New York in ways that are not related to the bus that crashed.

Second, though the Court previously framed its discussion of purposeful availment in terms of C.P.L.R. § 302(a)(3)(ii), it made abundantly clear that the concept is ultimately a requirement under federal due process.  *Hume II,* 2016 WL 1031320, at *21 ("Notably, the purposeful availment component requires an analysis under both the long-arm statute and due process.").  In other words, purposeful availment is, first and foremost, a requirement under the United States Constitution.  *See Nicastro*, 564 U.S. at 877.

---

[6]      The Court has already ruled out general jurisdiction over Tarten, that is, jurisdiction over the defendant regardless of whether the acts that form the basis for jurisdiction are related to the dispute. *Hume II*, 2016 WL 1031320, at *10.  For reasons unclear to the Court, one of the parties opposing Tarten's motion, Hume, continues to make baseless arguments that Tarten is subject to general jurisdiction.  ECF No. 280 at 11.  As the Court implied in the closing paragraph of its previous decision, it is close to sanctioning the parties for these types of arguments.

C.  Discussion

The renewed arguments by the parties attempting to show that personal jurisdiction exists over Tarten are set forth briefly below.

First, Hume has come forward with a variety of new facts which purport to show Tarten's extensive contacts with New York.  For example, a Tarten representative has testified that Tarten employees frequently traveled into New York to service vehicles.  ECF No. 280 at 4.  Tarten also frequently sold parts to New York customers.  *Id.*  This testimony is supported by an array of Tarten invoices showing that, indeed, from 2010 to 2014, Tarten made frequent service trips to companies located throughout upstate and downstate New York (ECF No. 280-5), and it also sold parts to companies across the state (ECF No. 280-4).  In 2011 alone, Tarten had more than 100 customers in New York.  ECF No. 280-2 at 52–53.  Generally speaking, by Hume's telling, Tarten is a big, international company—in 2014, approximately one fifth of its $6 million in net revenue derived from international commerce—that frequently targeted New York.  ECF No. 280-8 at ¶¶ 5–6.

Bisson largely reiterates these facts.  He again states that Tarten employees frequently traveled to New York to service vehicles and Tarten sold parts in New York.  ECF No. 281-7 at 11, 16.  Additionally, Bisson points out that, according to a Tarten representative, Tarten occasionally took referrals "for the repair of New York buses."  *Id.* at 12.  Furthermore, Bisson asserts that Tarten advertised its products and services in publications distributed across the United States and, more specifically, New York.  *Id.* at 11, 16.  Once again, the idea here is that Tarten is an a big, international company that frequently targeted New York.

In evaluating these new facts, there is no doubt that Hume and Bisson have shown that Tarten  purposefully  acted  towards  New  York  in  various  ways.    Most  notably,  Tarten

purposefully acted towards New York when its employees traveled into New York to service vehicles, and Tarten purposefully acted towards New York when it sold vehicle parts to New York customers.

The problem, however, is that Bisson and Hume are attempting to establish *specific jurisdiction* over Tarten. As stated in the discussion of the legal standard, specific jurisdiction requires that the act which forms the basis for jurisdiction also be related to the dispute at hand. *See Hume*, 2016 WL 1031320, at *12 ("[S]pecific jurisdiction . . . [requires that the] Plaintiff's claims . . . specifically 'arise from' the defendant's in-state activities.") (citations omitted). Here, Bisson and Hume have merely set forth a variety of purposeful acts by Tarten that have nothing to do with the dispute at hand. Bisson and Hume do not at all assert, for instance, that Tarten traveled into New York to perform a repair *on the bus that crashed* or sold parts into New York *for the bus that crashed*. For this reason, the parties have failed once again to make a *prima facie* showing that Tarten purposefully availed itself of the privileges of conducting business in New York in a manner relevant to this case. Accordingly, Tarten's motion to dismiss for lack of personal jurisdiction must be granted with respect to the claims asserted by every party except ZF Friedrichshafen AG ("ZF"), which is discussed separately below.

The Court makes one final observation with regard to personal jurisdiction over Tarten. In New York state court, various passengers on the bus that crashed have filed 35 separate actions against many of the same parties in this case, including Tarten. *See Alleyne-Dickson et al. v. Hume et al.*, CA2012-2255 (Sup. Ct. 2012). Tarten also moved to dismiss for lack of personal jurisdiction in those actions. ECF No. 281-3. In a decision issued April 19, 2016, the state court denied Tarten's motions and thus determined that it *did* have personal jurisdiction over Tarten. ECF No. 281-3 at 8–9. Thus, the parties opposing Tarten alternatively argue that

under principles of issue preclusion, this Court is effectively precluded from finding that it *does not* have personal jurisdiction over Tarten in this case.  ECF Nos. 280 at 3–7; 282 at ¶ 9.

The opposing parties are correct that as a general matter, issue preclusion "bars parties from relitigating issues that have already been litigated and determined by a court in a prior action." *McGowan v. Schuck*, No. 12-CV-6557-FPG, 2016 WL 4611249, at *9 (W.D.N.Y. Sept. 6, 2016).  Moreover, federal courts must "afford the same full faith and credit to state court judgments that would apply in the State's own courts." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 463 (1982) (citing 28 U.S.C § 1738).  Accordingly, in basic terms, the doctrine of issue preclusion "applies with full force when the prior action was in state court and the subsequent action is in federal court." *McGowan*, 2016 WL 4611249, at *9.

The Court declines, however, to apply issue preclusion in this instance.  As the Court has made clear, the United States Constitution only allows courts to exercise specific jurisdiction over a defendant that "purposefully avails" itself of the privileges of New York in a manner related to the dispute at hand.  *Nicastro*, 564 U.S. at 880.  In the state court decision, there is no discussion or application of this constitutional requirement—the state court found that it had jurisdiction over Tarten based on the facts that (1) it was reasonably foreseeable to Tarten that the bus it repaired would enter New York, and (2) Tarten had contacts with New York that are not related to the bus that crashed.  ECF No. 281-3 at 3–10.  Once again, these facts are simply not enough to satisfy the requirements of federal due process.  Accordingly, the state court decision with regard to Tarten is constitutionally infirm.  This Court need not give preclusive effect to a constitutionally infirm judgment.  *See Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to

23

such a judgment.").

    D.  <u>ZF's Argument Regarding Tarten's Waiver of Jurisdictional Objections</u>

Finally, the Court addresses an argument that is uniquely asserted by ZF, another defendant in this case.  Based on the Amended Complaint, ZF is the designer and manufacturer of the bus's transmission.  ECF No. 37 at ¶ 48.  In short, ZF argues that Tarten has waived its jurisdictional objection as to ZF's crossclaims against Tarten.  ECF Nos. 136; 152.

A brief procedural background is necessary to assess this argument.  In Tarten's answer to Hume's Amended Complaint, Tarten asserted crossclaims for contribution and indemnification against multiple parties, including ZF.  ECF No. 47 at ¶ 39.  ZF responded with its own crossclaims for contribution and indemnification against Tarten.  ECF No. 58 at ¶¶ 47–49.  Tarten then filed an answer to ZF's crossclaims and, critically, *did not assert the defense of lack of personal jurisdiction in that answer*.  ECF No. 66.  In a subsequent motion, Tarten then moved to dismiss all crossclaims asserted against it, including ZF's crossclaims, for lack of personal jurisdiction.  ECF No. 94.  The pending motion is, of course, the renewed version of that motion following jurisdictional discovery.  ECF No. 278.

With this background in mind, ZF's waiver argument is as follows: Because Tarten asserted crossclaims against ZF before ZF asserted claims against Tarten, Tarten has waived any personal jurisdiction defense it has as to ZF's crossclaims.  In other words, "once jurisdiction is invoked, it cannot be denied;" Tarten invoked the Court's jurisdiction by filing crossclaims against ZF, so it cannot now argue that the Court lacks jurisdiction over the crossclaims that ZF filed in return.  ECF No. 152 at 1.

In support of this argument, ZF cites New York state case law.  ECF No. 136 at 2–4.  This case law indeed stands for the proposition that when one defendant affirmatively asserts a

crossclaim for apportionment of liability against another defendant—as Tarten appears to have done here against ZF—that first defendant waives its personal jurisdiction defense against the second defendant. *See Bartley v. Reedman*, 86 A.D.2d 820, 821 (1st Dep't 1982). The Court previously asked for and accepted further briefing on this waiver argument. ECF Nos. 256; 257; 261; 262; 269; 272.

The Court now believes there is a simpler and more appropriate way to deal with the issue. It is axiomatic that for a federal court sitting in diversity jurisdiction, when an issue is covered by a "valid" Federal Rule of Civil Procedure, the court must apply that rule. *Hanna v. Plumer*, 380 U.S. 460, 471, 474 (1965). The issue here, once again, is as follows: Has Tarten waived its defense of personal jurisdiction with regard to ZF's crossclaims? Rule 12(h) of the Federal Rules of Civil Procedure is directly on point and provides a straightforward answer: Yes. Rule 12(h) dictates that "a party forfeits its defense of lack of personal jurisdiction by failing timely to raise the defense in its initial responsive pleading." *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 134 (2d Cir. 2011) (citing Fed. R. Civ. P. 12(h)). Here, Tarten failed to timely raise the defense of lack of personal jurisdiction in its initial responsive pleading to ZF's crossclaims. ECF No. 66. Based on Rule 12(h), that is the end of the matter—Tarten has waived the defense of lack of personal jurisdiction as to ZF's crossclaims. There is no need to wade into state law about whether a party waives its jurisdictional defense by affirmatively asserting crossclaims.

The Court provides two final observations. First, a federal court may only apply the federal rule in such cases if the rule is "valid." *See Hanna*, 380 U.S. at 474. By "valid," courts essentially mean that the rule "regulates matters which can reasonably be classified as procedural" as opposed to substantive. *Burlington N. R. Co. v. Woods*, 480 U.S. 1, 8 (1987).

There can be no real doubt that Rule 12 generally, and Rule 12(h) specifically, are procedural and thus "valid." Notably, the Supreme Court has found that every single Federal Rule of Civil Procedure it has ever examined to be procedural and, thus, valid. *See Retained Realty, Inc. v. McCabe*, 376 F. App'x 52, 56 n.1 (2d Cir. 2010). Rule 12 is no different—its purpose is to "expedite and simplify the pretrial phase of federal litigation." C. Wright & A. Miller, 5B Federal Practice and Procedure § 1342 (3d ed. 2004). More specifically, Rule 12(h) is also self-evidently procedural in having as its purpose the "avoidance of time-consuming, piece-meal litigation of pre-trial motions." *Id.* at § 1391 (citations omitted). Accordingly, this Court finds that Rule 12(h) is valid and thus applies it to this situation.

Second, the Court observes that more than a year after filing its original answer to ZF's crossclaims, Tarten moved to amend its answer. ECF No. 175. Tarten's proposed amended answer includes, unsurprisingly, a personal jurisdiction defense. ECF No. 175-2 at ¶ 2. United States Magistrate Judge Jonathan W. Feldman has held Tarten's motion to amend in abeyance pending this decision. ECF No. 196.

To the extent Tarten is moving to amend its answer so that it would not face the problem set forth above—that is, waiving its personal jurisdiction defense by failing to include it in its original answer—that motion is futile. Rule 12(h) again is directly on point here. It provides that a party waives its defense of lack of personal jurisdiction if it fails to "include it in a responsive pleading *or in an amendment allowed by Rule 15(a)(1) as a matter of course.*" Fed. R. Civ. P. 12(h)(ii) (emphasis added). The effect of this italicized language is that a party has only a very limited way to cure the problem of failing to include a personal jurisdiction defense in its original answer. In short, the party can amend its answer "as a matter of course," meaning that the party can amend its answer within "21 days after serving it." Fed. R. Civ. P. 15(a)(1).

Here, Tarten is trying to amend its answer more than a year after serving it (ECF Nos. 66 at 4; 175).   Accordingly, even if Tarten were permitted to amend its answer so that it includes a personal jurisdiction defense, this would not cure the problem here—its personal jurisdiction defense with respect to ZF's crossclaims would still be waived.[7]

In sum, Tarten's motion for lack of personal jurisdiction with respect to all claims and crossclaims asserted against it (ECF No. 278), with the notable exception of the crossclaims asserted against it by ZF, is GRANTED.

## IV.   *Forum Non Conveniens*

### A. Background

In their motions to dismiss for lack of personal jurisdiction, D-Ltd. and Tarten alternatively argue that this entire action should be dismissed on *forum non conveniens* grounds. ECF Nos. 248-7 at 25–26; 278-2 at 42.   D-Ltd. and Tarten have also made this argument in past jurisdictional motions.   ECF Nos. 52-2 at 15–22; 72-1; 82-2; 91-1 at 16–23; 93-1; 94-1. Additionally, Setra has "incorporate[d] by reference" the *forum non conveniens* argument in one of its own motions to dismiss.   ECF No. 73-1 at 15–16.

The Court has thus far held off on ruling on the *forum non conveniens* argument, noting in prior decisions that it would decide the issue after the parties conducted jurisdictional discovery.   *Hume I*, 2015 WL 5773632, at *9; *Hume II*, 2016 WL 1031320, at *8.   It is now ready to decide the issue.

Generally speaking, the "purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient."   *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).   Accordingly, D-Ltd. and Tarten argue that a Canadian court would be a more convenient forum for a variety of

---

[7]      The Court observes that Tarten's proposed amended answer includes a variety of other additions not related to the personal jurisdiction defense.   Accordingly, this decision is not a denial of Tarten's motion to amend (ECF No. 175) as futile; that motion is still pending before Judge Feldman.

reasons, including that four of the parties in the case are Canadian, the allegedly negligent repair of the bus took place in Canada, and Plaintiff Hume is not even a resident of New York. ECF Nos. 52-2 at 15–22; 91-1 at 16–23.

Bisson, meanwhile, raises the point that in the parallel New York state proceeding instituted by various bus passengers, the state court already decided this issue. ECF No. 281-7 at 3–7. In that proceeding, Tarten and D-Ltd.[8] also moved to dismiss on the basis of *forum non conveniens*. On January 15, 2015, the state court rejected the *forum non conveniens* argument and thus denied the motion. ECF No. 281-3 at 21–22. Accordingly, Bisson argues that under principles of issue preclusion, the parties are precluded from relitigating the *forum non conveniens* issue in this case. The legal standard for issue preclusion is set forth briefly below.

B. Legal Standard

Issue preclusion indeed bars parties from relitigating issues that have already been litigated and determined by a court in a prior action. *See Constantine v. Teachers Coll.*, 448 Fed.Appx. 92, 93 (2d Cir. 2011). In the context of the federal court looking to a prior state court judgment, the federal court must give the same preclusive effect to that judgment "as would be given . . . under the law of the [s]tate in which the judgment was rendered." *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir. 1996) (citing the Full Faith and Credit Statute, 28 U.S.C. § 1738). In other words, this Court looks to New York law to determine whether issue preclusion applies here.

Under New York law, issue preclusion has three elements: (1) the same issue was raised in both proceedings; (2) the issue was actually decided, and necessary to that decision, in the prior proceeding; and (3) the plaintiff had a full and fair opportunity to contest the issue in the prior proceeding. *See McGowan v. Schuck*, No. 12-CV-6557-FPG, 2016 WL 4611249, at *9

---

[8] Setra is also a party in the state court action.

(W.D.N.Y. Sept. 6, 2016).   If all three elements are met for an issue, the parties may not

relitigate the issue in question in a subsequent action. These three elements are discussed below

with respect to the *forum non conveniens* issue.

C. <u>Discussion</u>

*1. Same Issue*

The first element requires that the same issue was raised in both proceedings.  Here, a

review of the state court decision makes clear that the issue is the same in both proceedings.  The

state court explicitly stated that Tarten and D-Ltd. filed their motion "pursuant to CPLR 327(a),

or what we refer to as . . . forum non conv[eniens]."  ECF No. 281-3 at 21.  Furthermore, based

on the state court decision, it appears that Tarten and D-Ltd. have set forth substantially the same

arguments in both actions.  *Id.* at 21–22.  Finally, courts are in agreement that the legal analysis

would be the same in both courts.  *See Peters v. UBS AG*, No. 13 CIV. 3098 PAC, 2014 WL

148631, at *3 (S.D.N.Y. Jan. 15, 2014), *aff'd*, 588 F. App'x 57 (2d Cir. 2014) ("Courts consider

the New York law of *forum non conveniens* to be virtually identical to the federal law.") (internal

quotations, alterations, and citations omitted).

Accordingly, it is clear that the first element of issue preclusion is satisfied.

*2. Issues Were Actually Decided by Prior Court and Necessary to Decision*

The second element of issue preclusion requires that the issue or issues were *actually*

*decided* by the prior court and *necessary* to that decision.

Here, there is no doubt that the state court actually decided the *forum non conveniens*

issue.  After setting forth the relevant facts, the state court straightforwardly ruled as follows:

"[T]here does not appear to be a more appropriate forum than New York.  Therefore, for the

reasons stated above, the motion by [D-Ltd.] and Tarten pursuant to CPLR 327(a) are denied."

ECF No. 281-3 at 21–22.

Additionally, the state court's determination was *necessary* to its ultimate decision not to dismiss the action. In other words, the determination was certainly not *dicta*—if the the state court came out differently on the *forum non conveniens* issue, the action would have been dismissed.

Accordingly, the second element of issue preclusion is satisfied.

*c. Full and Fair Opportunity to Litigate*

The third element requires that the plaintiff had a full and fair opportunity to contest the issue at the prior proceeding. In making this determination, this Court must consider the "realities of the prior litigation, including the context and other circumstances which may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him." *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 501 (1984) (internal quotations, alterations, and citations omitted). Notably, "the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995).

Here, Tarten and D-Ltd. and have not at all asserted that they were deterred or discouraged from fully litigating the *forum non conveniens* issue in state court. Accordingly, the third element of issue preclusion is also satisfied.

In sum, Tarten, D-Ltd., and Setra are precluded from relitigating the *forum non conveniens* issue in this case. Thus, their motions to dismiss on the basis of *forum non conveniens* (ECF Nos. 52; 72; 73; 82; 91; 93; 94) are DENIED.

### IV.   Conclusion

For the reasons above, the Court makes the following determinations. First, D-Ltd.'s

motion to dismiss for lack of personal jurisdiction (ECF No. 248) is DENIED.  Second, Tarten's motion to dismiss for lack of personal jurisdiction with respect to all claims and crossclaims asserted against it (ECF No. 278), with the exception of the crossclaims asserted against it by ZF, is GRANTED; conversely, Tarten's motion to dismiss ZF's crossclaims is DENIED.  Third, all motions to dismiss on the basis of *forum non conveniens* (ECF Nos. 52; 72; 73; 82; 91; 93; 94). are DENIED.

IT IS SO ORDERED.

Dated: November 3, 2016
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court